UNITED STATES of America ex rel. James P. FREE, Jr., Petitioner,

v.

Howard PETERS, III, Michael P. Lane and Neil F. Hartigan, Respondents.

No. 89 C 3765.

United States District Court, N.D. Illinois E.D.

Sept. 24, 1992.

Kimbal Richard Anderson, Winston & Strawn, Chicago, Ill., for petitioner.

Vincenzo Chimera, Paula J. Giroux, Arleen C. Anderson, Illinois Attorney General's Office, Jack Donatelli, U.S. Attorney's Office, Richard Schwind, Attorney General's Office, Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Today we resolve the following challenges to the constitutionality of the Illinois death penalty scheme, Ill.Rev.Stat. ch. 38, ¶ 9–1: (1) that the statute and jury instructions impose a presumption in favor of death in violation of the Eighth and Fourteenth Amendments of the United States Constitution (Ground 5) [1]; (2) that the act is unconstitutionally vague and fails to narrowly channel and guide the sentencing authority's discretion, thereby creating the impermissible risk that the death sentence will be imposed arbitrarily and capriciously (Ground 10); and (3) that the failure of the Illinois sentencing scheme to assign a specific standard of proof as to the ultimate issue renders the scheme unconstitutional (Ground 14). As noted in our order dated November 5, 1991, *see United States ex rel. Free v. Peters ("Free IV")*, 778 F.Supp. 431, 434 (N.D.Ill.1991), each of the above contentions has been rejected either by the Seventh Circuit in *Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), or by this court in *Williams v. Chrans*, 742 F.Supp. 472 (N.D.Ill.1990), *aff'd*, 945 F.2d 926 (7th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). Nevertheless, we concluded that Free's proffer of a jury survey conducted in April of 1990 by Professor Hans Zeisel, along with an affidavit by Professor Zeisel interpreting the results of that survey, "call[s] into question the empirical assumptions as to juror comprehension which served as the predicate to the rulings in both [*Silagy* and *Williams*]." *Free IV*, 778 F.Supp. at 434–35. Consequently, we referred the matter to Magistrate Judge Bernard Weisberg to assess (1) the validity of the Zeisel study, and (2) its impact on each of the grounds (5, 10 & 14) for which it is offered as support. *Id.* at 436.

Magistrate Judge Weisberg conducted an evidentiary hearing on January 13, 14 and 15, and February 4, 5 and 7, 1992, at which various expert witnesses testified regarding empirical jury studies, statistics, survey methodology and linguistics. Much of the January testimony focused on the similarity between the 1987 Illinois Pattern Instructions ("IPI"), utilized in the April 1990 study, and the actual jury instructions provided at the *Free* sentencing. In order to preempt the issue, during the January recess, Dr. Zeisel conducted a second survey identical in all respects to the previous study, but substituting the *Free* instruc-

---

1. In his petition for writ of habeas corpus, filed on May 8, 1989, Free raised twenty-one separate grounds for relief. On November 5, 1991, this court reserved ruling on three grounds, dismissing the remaining eighteen. *See United States ex rel. Free v. Peters*, 778 F.Supp. 431, 448 (N.D.Ill.1991). Consistent with our previous order, we designate each of Free's arguments as "Ground __".

tions in the place of the 1987 IPI instructions.[2] Both surveys were designed to test juror comprehension of the following five issues: (1) whether a jury must unanimously agree on the existence of a mitigating factor before that factor can be considered by an individual juror (questions 4 and 5); (2) whether the jury may properly consider mitigating factors not enumerated in the jury instructions (questions 1, 2, 6, 7, 8, 9, 10, and 11); (3) whether the existence of a mitigating factor bars a sentence of death (question 3); (4) which side shoulders the burden of proof on the appropriate sentence (questions 12, 13, 14 and 15); and (5) whether a jury which is divided on the penalty issue should return a verdict or tell the judge they cannot reach a unanimous verdict (question 16).

On July 7, 1992, Magistrate Judge Weisberg filed and served upon the parties his Report and Recommendation, fifty-two pages in length. After careful and thoughtful consideration, Magistrate Judge Weisberg found "that the Zeisel surveys are valid, meaning that within standard margins of error the survey results are true, that is, they fairly represent the levels of comprehension of the survey respondents regarding the capital sentencing instructions used in those surveys." Report and Recommendation at 20. Considering the impact of the studies on Free's case, Magistrate Judge Weisberg determined that "there is a reasonable likelihood that a substantial number of jurors who received the IPI instructions and [a substantial number] of Free's jurors believed that only the statutory mitigating factors, or factors comparable to them, could preclude the imposition of the death penalty." *Id.* at 36. Further, the Magistrate Judge concluded that "the *Free* jury, like juries receiving the IPI instructions, was probably confused about which side, if any, had a burden of persuasion and what the nature of that burden was." *Id.* at 46. Accordingly, Magistrate Judge Weisberg recommended that Free's petition for habeas relief be granted with respect to Grounds 5, 10 and

14. Both Free and respondents have filed timely objections to the Magistrate Judge's Report and Recommendation.

In Section I of this opinion, we will address respondents' procedural challenges to the propriety of the hearing before Magistrate Judge Weisberg, including questions respecting the burden of proof, procedural default, failure to factually develop legal claims and standing to challenge the IPI instructions. Section II will consider respondents' objections to Magistrate Judge Weisberg's determination that the Zeisel studies are statistically reliable and valid. Finally, Section III will resolve the parties' exceptions to the Magistrate Judge's assessment of the impact of the empirical evidence on Free's remaining claims (Grounds 5, 10 & 14).

### I. Challenges to the Propriety of the Proceedings Before the Magistrate Judge

#### A. *Burden of Proof*

■ Respondents begin their attack on the Report and Recommendation by arguing that the Magistrate Judge improperly shifted the burden of proof to the respondents to produce evidence that the studies are invalid. Respondents are mistaken. To be sure, the burden of proving that "there is a reasonable likelihood that the jury has applied the challenged instruction[s] in [a manner inconsistent with the dictates of the United States Constitution]" rests upon Free during the entirety of these proceedings. *See Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); *Williams v. Chrans*, 945 F.2d 926, 938 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). As distinguished from the burden of proof, the duty of going forward with evidence necessarily shifts from side to side as the proceedings progress, according to the nature and strength of the evidence offered in support or denial of the proposition to be established. 9 John Henry Wigmore, *Evidence* § 2487, at

**2.** The 1990 Zeisel survey employing the 1987 IPI instructions is attached as Appendix A to this opinion. The 1992 Zeisel survey, which used

the actual *Free* jury instructions, is attached as Appendix B.

292–97 (Chadbourn rev. 1981). Bearing the burden of proof, Free also shoulders the initial duty of producing evidence (*i.e.*, establishing a prima facie case that it is reasonably likely that his jurors applied the jury instructions impermissibly). *Id.* at 293. Once Free has satisfied this duty, a presumption in his favor arises requiring respondents to produce evidence in rebuttal. *Id.* at 294–95.

In order to meet his initial burden of production, Free presented the testimony of several notable experts on jury decision-making, juror comprehension and jury research methodology.[3] Professor Hans Zeisel, "a scholar of unquestionable objectivity," Report and Recommendation at 28, testified to the design and administration of the surveys, as well as the reliability and significance of the results. Likewise, Professors Shari Diamond, Valerie Hans and Peter Rossi, experts in statistics, jury decisionmaking and jury research methodology, testified to the reliability of, and implications flowing from, the survey data. Further, Free presented the testimony of Professor Judith Levi, a respected scholar in the field of linguistics, which addressed the similarity of the IPI and *Free* instructions and the sources of miscomprehension likely to arise from those sets of jury instructions. Faced with this substantial and credible evidence, Magistrate Judge Weisberg properly concluded that Free's proffer had established a prima facie case. Consequently, the burden of production shifted to respondents to present evidence in rebuttal. Respondents relied exclusively on the testimony of Dr. Paul J. Lavrakas, a professor of journalism and expert in research methodology. As discussed *infra* Section II, Magistrate Judge Weisberg considered Lavrakas' criticisms of the Zeisel surveys in great detail, rejecting his appraisal and concluding that the studies are reliable and valid. Report and Recommendation at 15–24. In reaching his conclusion, Magistrate Judge Weisberg necessarily had to weigh competing testimony and make certain credibility decisions. This process, howev-

er, does not evince an impermissible shifting of either the burden of proof or production.

▇ Other than disagreeing with the substance of the Magistrate Judge's conclusion, respondents imply that, in order to meet his burden via statistical evidence, Free must eliminate all alternative hypotheses. This, however, is a misstatement of Free's burden. *See Allen v. Seidman*, 881 F.2d 375, 380 (7th Cir.1989) ("The Corporation's attack on the plaintiffs' statistical case amounts to a contention that unless a plaintiff eliminates all alternative hypotheses he must lose. That would raise the threshold of proof too high."). We cannot conclude that Magistrate Judge Weisberg impermissibly shifted the burden of proof to respondents merely because he declined to accept the unsupported speculation of their expert witness.

### B. *Procedural Default*

In a post-hoc attempt to nullify portions of the proceedings before Magistrate Judge Weisberg in their entirety, respondents assert that each of Free's current claims are procedurally defaulted, with the exception of (1) the portion of Ground 10 alleging that the jury instructions given at his sentencing hearing did not provide the jury with sufficient guidance on whether non-statutory mitigating factors may be considered, and (2) the allegation in Ground 5 that the death penalty statute and jury instructions created an unconstitutional presumption in favor of death. However, as poignantly noted by Free, respondents' contention is not an objection to the Magistrate Judge's Report and Recommendation, but rather a request for reconsideration of our previous ruling. On November 5, 1991, this court unequivocally held that the constitutional bases of Grounds 10 and 14 were "fairly presented" to the Illinois Supreme Court on direct appeal. *Free IV*, 778 F.Supp. at 435–36 n. 3. Respondents' argument is not only improperly before the court at this time, but devoid of any show-

---

3. A summary of the principal witnesses' credentials is contained in the Magistrate Judge's Report and Recommendation and will not be re-

peated here. *See* Report and Recommendation at 9–10.

ing of a manifest error of law or fact. Consequently, respondents' "objection" to the propriety of the proceedings via the procedural default doctrine is overruled.

### C. Failure to Factually Develop Legal Claims

In light of the recent Supreme Court decision in *Keeney v. Tamayo–Reyes*, —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), respondents argue that Free's failure to develop the factual predicate for Grounds 5, 10 and 14 in state court precludes a federal hearing on the matter. We disagree.

■ In *Tamayo–Reyes*, petitioner, a Cuban immigrant with minimal education and almost no knowledge of the English language, plead *nolo contendere* to first-degree manslaughter. *Id.* —— U.S. at ——, 112 S.Ct. at 1716. In a state collateral attack on the plea, Tamayo–Reyes maintained that his plea had not been knowing and intelligent because his translator had not explained the nature of the plea agreement or the *mens rea* element of manslaughter. *Id.* Following a hearing, the state court dismissed Tamayo–Reyes's petition, finding that the interpreter fully and accurately translated the colloquy during the plea hearing. *Id.* —— U.S. at ——, 112 S.Ct. at 1716–17. Tamayo–Reyes brought a petition for habeas relief in federal district court, arguing that the material facts concerning the translation were not sufficiently developed during the state-court hearing. *Id.* —— U.S. at ——, 112 S.Ct. at 1717. Reversing the Ninth Circuit and overruling *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court held that, to be entitled to an evidentiary hearing in federal court, a habeas petitioner must show cause for and demonstrate actual prejudice from his failure to adequately develop the evidentiary basis of his claims in state-court proceed-

ings. *Tamayo–Reyes*, —— U.S. at ——, 112 S.Ct. at 1721.

In the instant case, although Free fairly presented his present claims on direct appeal, it is undisputed that the evidentiary basis for those claims—*i.e.*, the Zeisel studies—was never presented to the Illinois courts, either on direct appeal or in a petition for post-conviction relief.[4] Nonetheless, assuming that *Tamayo–Reyes* applies retroactively and, as such, that Free must show cause for and prejudice from his failure to present the Zeisel surveys to the state courts prior to seeking federal habeas relief, the instant case presents the rare circumstance wherein this heightened level of scrutiny is met.

■ Establishing "cause" ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the evidence. *Tamayo–Reyes*, —— U.S. at —— – —— n. 5, 112 S.Ct. at 1720–21 n. 5 (citing *Murray v. Carrier*, 477 U.S. 478, 492, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986)). The evidence adduced at the hearing before Magistrate Judge Weisberg clearly supports the proposition that empirical data such as the results of the Zeisel studies "was unavailable to Free at the time of his prior state court petitions." *Free IV*, 778 F.Supp. at 436 n. 3. The relevant question for purposes of the present inquiry is whether Free and his attorneys could have carried out a study similar to those conducted by Zeisel, and not whether Zeisel himself could have performed the survey at an earlier date. Magistrate Judge Weisberg found, and we agree, that the initial Zeisel study conducted in April of 1990, represented an effort entirely independent from Free and his attorneys. Report and Recommendation at 27. Indeed, the survey was commissioned by David Bradford, a lawyer working for the MacArthur Justice Center. Transcript

4. On January 24, 1983, the Illinois Supreme Court affirmed Free's conviction and sentence. *People v. Free ("Free I")*, 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218, *cert. denied*, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Free subsequently filed two separate petitions for post-conviction relief in the Illinois state courts. The trial court dismissed each petition and the Illi-

nois Supreme Court affirmed each dismissal. *People v. Free ("Free II")*, 112 Ill.2d 154, 97 Ill.Dec. 396, 492 N.E.2d 1269, *cert. denied*, 479 U.S. 871, 107 S.Ct. 246, 93 L.Ed.2d 170 (1986); *People v. Free ("Free III")*, 122 Ill.2d 367, 119 Ill.Dec. 325, 522 N.E.2d 1184, *cert. denied*, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988).

at 18–19, 60–61 (testimony of Prof. Zeisel). The only involvement by Free and his attorneys in the creation or conduct of the 1990 Zeisel study was the grant of permission to use the facts of the *Free* case. Transcript at 4, lines 10–14 (statement of Kimball Anderson). Having established the independence of the study, it follows that Free could not have reasonably produced such empirical evidence on his own initiative prior to April of 1990 (*i.e.*, Free could only wait for the existence of the Zeisel survey data). In an effort to rebut this conclusion, respondents could have proffered evidence indicating a reasonable probability that Free could have obtained (1) another academic expert in jury research willing to conduct such a survey at Free's request, and (2) access to either the Cook County or DuPage County Circuit Court jury panels. Respondents, however, did not. Report and Recommendation at 27. Clearly, Free received a windfall in that the principles Zeisel and Bradford sought to establish necessarily must arise in the context of a specific case and, of all the appeals involving Illinois capital defendants, they chose *Free*. Transcript at 86, lines 8–15 (testimony of Prof. Zeisel). Nonetheless, that fortune does not negate the fact that until the Zeisel survey was conducted in April of 1990, such empirical data was not reasonably available to Free at the time of his prior state-court proceedings.

Finding sufficient Free's showing of cause for his failure to develop the factual foundation of his legal claims, we are left with the question of whether Free has established "actual prejudice" for the default. As noted by Magistrate Judge Weisberg, this issue hinges on the applicability of the Zeisel survey results to the *Free* jury itself. Report and Recommendation at 26 n. 8. Based on the conclusions drawn *infra* Section III, we hold that Free's failure to produce similar empirical evidence during his prior state-court proceedings does not bar this court from considering the Zeisel studies in support of Grounds 5, 10 and 14.

### D. *Standing to Challenge the IPI Instructions*

The gravamen of respondents' standing argument is that the *Free* jury did not receive the IPI instructions used in the 1990 Zeisel survey and, as such, Free was not "entitled to have the court decide the merits of any claims challenging the use of those instructions." Respondent's Objections to Report and Recommendation at 23–24. This contention, however, misses the mark. Indeed, Free does not claim that his death sentence must be vacated because the IPI instructions do not pass constitutional muster. Rather, the basis of Free's current petition is that the specific instructions given to his jury at sentencing did not provide them with constitutionally sufficient guidance. The relevance of the IPI instructions, and thus the relevance of the 1990 Zeisel survey testing juror comprehension on the basis of those instructions, comes with their similarity to the actual *Free* instructions. Assuming the IPI instructions are substantially similar to those used in *Free*, that the IPI instructions utilized in the 1990 Zeisel study did not provide jurors with constitutionally adequate guidance is a reasonable indication that neither did the *Free* instructions. Consequently, we turn to consider the similarity of the two sets of instructions.

To establish the substantial similarity between the IPI and *Free* jury instructions, both of which meticulously track the language of the Illinois death penalty statute, Free presented the expert testimony of Professor Judith Levi, a linguistics scholar specializing in the interaction between language and the law. Professor Levi prepared and presented detailed exhibits comparing the IPI instructions to those used in *Free*, concluding that the two sets of jury instructions are substantially similar in all material respects.[5] Indeed, to the extent that minor language variations appear between the IPI and *Free* instructions, Professor Levi concluded that in the vast majority of those cases the *Free* instructions provided less guidance than the IPI instruc-

---

**5.** Attached as Appendix C to this opinion is Professor Levi's point by point comparison of the two sets of instructions.

tions used in the 1990 Zeisel study. Transcript at 548–61. For example, with respect to the whether the jury may properly consider non-statutory mitigating factors, the IPI instructions state in relevant part:

Mitigating factors include:

That the murder was committed while the defendant was under the influence of an extreme mental or emotional disturbance, although not such as to constitute a defense to the prosecution.

The defendant has no significant history of prior criminal activity.

The murdered person was a participant in the defendant's homicidal conduct or consented to the homicidal act.

The defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm.

The defendant was not personally present during the commission of the act or acts causing death.

The defendant may be rehabilitated or restored to useful citizenship.

*Any other reason supported by the evidence why the defendant should not be sentenced to death.*

The *Free* instructions, on the other hand, provide:

Mitigating factors include *but are not limited to* the following circumstances.

One, the Defendant has no significant history of prior criminal activity.

Two, the murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution.

If, from your consideration of the evidence, you find that any of the above mitigating factors are present in this case, or *that any other mitigating factors are present in this case* then you should consider such factors in light of any existing aggravating factors in determining whether the death sentence shall be imposed.

Professor Levi explained that for two distinct reasons the *Free* instructions provide less guidance than the IPI jury instructions on the issue of non-statutory mitigating factors. First, as a matter of syntax, the IPI instructions present a list of mitigating factors as examples and include as a separate item in that list "[a]ny other reason supported by the evidence why the defendant should not be sentenced to death." On the other hand, the idea that jurors may properly consider mitigating factors not explicitly listed in the instructions is expressed in the *Free* instructions in a subordinate clause "imbedded inside of a complex instruction." This difference in syntax renders the *Free* instructions inferior to the IPI jury instructions. Transcript at 488–89, 542. Second, the IPI instructions include as an example "[t]he defendant may be rehabilitated or restored to useful citizenship." According to Professor Levi, this example is qualitatively different than any of the others in that it focuses on the future, as opposed to the crime itself or the past in general. Transcript at 543, lines 1–15. Because such an example is not given in the *Free* instructions, those instructions "give a much more limited impression to the jurors of what they can count as mitigating factors." Transcript at 543, lines 17–19.

Respondents' attempt to rebut this credible and substantial evidence comes in the form of a statement made by Professor Zeisel that "there may be points where the difference [between the two sets of instructions] is considered great enough so that my survey does not apply." Transcript at 41, lines 23–25. When placed in context, however, respondents' use of Zeisel's statement is nothing more than disingenuous. Immediately following his speculation, Professor Zeisel stated "the point I want to make is that I would not like to get into this discussion.... It is not my expertise." Transcript at 42, lines 1–3. Indeed, as respondents' counsel pressed Zeisel on cross-examination to compare the two sets of instructions, he emphatically stated:

Mr. Schwind, I think you might have heard me on direct examination, that I beg of you not to go with me into the distinctions between the Free instructions and the instructions I used.... Because I haven't studied it. Besides it's not my competence as a researcher to

make this judgments [sic], and as I suggested, the Court might have to do it, and I asked specifically at that time that you on cross should not go into this matter with me.

Transcript at 64, lines 16–25. In the absence of any evidence rebutting the Magistrate's well-founded conclusion that the two sets of instructions are substantially similar, we reject respondents' standing argument and find that the 1990 Zeisel survey is relevant in the determination of whether Free's jury received constitutionally adequate guidance.

## II. Statistical Reliability and Validity of the Zeisel Surveys

### A. *Documentation Respecting the Population Surveyed*

Professor Lavrakas testified that in his opinion "there was insufficient documentation for understanding what the population or the universe was." Transcript at 900, lines 12–14. Based on this opinion, respondents maintain that the Zeisel studies lack "construct validity," *i.e.*, whether a research instrument measures what it is claimed to measure. Professor Zeisel, however, testified in great detail as to the creation, methodology and administration of the survey, and set forth the precise population from which he drew his sample. Professor Lavrakas' confusion over this point likely stems from the fact that he was not present for the majority of Zeisel's testimony. *See* Transcript at 918, lines 18–19 (statement of Prof. Lavrakas). To be sure, Professor Zeisel defines the universe for his surveys as potential jurors from Cook County who are eligible to sit on a capital case. Transcript at 49, lines 12–25.

In light of the extensive testimony on the matter, we find respondents' objection to the lack of documentation frivolous.

### B. *Relevance of "Statistically Significant" Evidence*

Respondents concede that Free has in fact established that "Zeisel's survey data reveal a pattern of incorrect answers on the part of the participants that is significant at both the .05 and .01 levels." [6] Respondents' Objections to Report and Recommendation at 4. Nonetheless, respondents contend that the evidence does not support the proposition that this pattern of incorrect responses indicates miscomprehension on the part of the potential jurors surveyed. In other words, statistical significance in itself does not show that there is a substantial causal relationship between the incorrect answers and juror miscomprehension. Indeed, "[a]n explanatory theory and consideration of the surrounding facts is necessary to determine if there is a causal relationship." *Dixon v. Margolis*, 765 F.Supp. 454, 459 n. 8 (N.D.Ill.1991) (citing *Tagatz v. Marquette University*, 861 F.2d 1040, 1045 (7th Cir.1988)). Magistrate Judge Weisberg found that "[t]he Zeisel surveys on their face appear to be designed to measure jury comprehension of capital sentencing instructions," Report and Recommendation at 16, and the weight of the evidence adduced at the hearing supports this assertion. *See* Transcript at 45, lines 22–25 (The purpose of the surveys was "to test whether the—these instructions had created thoughts in the minds of the jurors who listened to them which led to potentially to unconstitutional decisions.") (statement of Prof. Zeisel); Transcript at 22–23

---

**6.** Levels of .05 and .01 refer to confidence intervals of 95% and 99% respectively. In circumstances where we cannot measure the precise value of the quantity in question, we must approach the quantity in terms of estimates. Take as an example the mean I.Q. of females residing in Cook County on any particular day, a value that would be too costly to measure precisely. A point estimate, for example, is a single number which represents our best guess at the true value of the unknown quantity. Thus, we may estimate that the mean I.Q. for females residing in Cook County on the day in question is 150. Often, we express our guess in terms of an interval. For example, we might estimate that, on the relevant date, the mean I.Q. for females residing in Cook County is between 145 and 155. When an interval estimate is accompanied with a specific level of confidence (or probability), it is termed a confidence interval. A 99% confidence interval, for instance, is an indication that if we repeated our measurement 100 times under identical conditions, 99 times out of 100 the point estimate derived from the repeated experimentation will fall within the initial interval estimate—in our example, between 145 and 155.

(As described by Prof. Zeisel, each question gives an example of some judgments jurors made in the hypothetical case and then asks whether the jurors followed the instructions, not whether they got the right or wrong result.); Transcript at 129, lines 10–17 ("[I]n terms of research design, and the study design, the purpose of the study, as I understood it, was to examine juror comprehension of the instructions, the judicial instructions. And that method that was adopted by Hans Zeisel is one that is commonly used, and the research field generally accepted as an appropriate scientific method for examining juror comprehension.") (statement of Prof. Hans); Transcript at 408, lines 4–6 (The Zeisel study "was specifically designed to test the jurors comprehension of the Illinois death penalty instructions.") (statement of Prof. Diamond); Transcript at 609, lines 9–22 ("[T]he purpose of the survey questions is to determine whether samples of potential jurors understood various aspects of jury instructions.... I believe it very clearly shows that the potential jurors that were surveyed were very divided and confused.") (statement of Prof. Rossi).

To belie the Magistrate Judge's conclusion that the Zeisel studies in fact measure juror comprehension, respondents, based on the testimony of Professor Lavrakas, contend that the incorrect answers could represent miscomprehension of the written questions making up the questionnaire. Likewise, respondents postulate that the incorrect answers may stem from such factors as poor literacy, fatigue, boredom and frustration. When pressed on cross-examination, however, Lavrakas could not substantiate any of these alternate hypotheses. For example, when asked to identify any portion of the survey questions that was ambiguous or biased, Lavrakas was unable to do so. Transcript at 947, lines 2–21.

In stark contradiction to Lavrakas' unsupported speculation, Free's experts presented convincing evidence affirmatively ruling out each of respondents' theories. Professor Zeisel testified that, in designing the questions with Bradford, he was very careful to ensure that they were "objective questions and could not be—would not bias the jurors in any direction." Transcript at 85, lines 4–5. That the questions were clear and unbiased was corroborated by the testimony of Professors Diamond, Hans, Levi and Rossi. See Transcript at 249, 1149 (with the exception of question 1, they are "really quite clear and are certainly unbiased in their construction") (statement of Prof. Diamond); Transcript at 136–155 (all but question 1 are clearly drafted and unbiased) (statement of Prof. Hans); Transcript at 602, line 11 ("the survey was written very clearly") (statement of Prof. Levi); Transcript at 610, lines 6–9 ("This particular questionnaire is a very short questionnaire as questionnaires go. In my opinion, it's very clearly written, with few ambiguities. There are no multiple parts or branching questions.") (statement of Prof. Rossi). Respecting the possibility that fatigue contributed to the results, one would expect that under such circumstances the potential jurors would have scored better on earlier numbered questions. Transcript at 1153–54 (statement of Prof. Diamond). As the results did not deteriorate from earlier to later numbered questions, and in the absence of any evidence to the contrary, we can only conclude that fatigue played no role in the survey results. Finally, Free presented compelling evidence that the data were not skewed as a result of random guessing or inadvertence on the part of the survey participants. The survey itself includes multiple questions on three of the five issues sought to be measured, a valid method of ensuring internal consistency. Transcript at 138, 206, 638 (testimony of Profs. Hans and Rossi). Indeed, to test the notion that the survey respondents did not take the questions seriously and merely guessed in a random fashion, Professor Rossi calculated the expected distribution of correct answers which would result from random behavior and compared it to the actual distribution. Transcript at 620, lines 7–12. Professor Rossi concluded that "large numbers of people scor[ed] systematically lower that one would expect if they were engaged in a casual sort of random response

behavior." Transcript at 622, lines 1–3. Further, Professor Diamond concurred with Rossi's interpretation of the data, asserting that "when we see these patterns here of clustering, that would be inconsistent with [random guessing]." Transcript at 1153, lines 19–20.

As a final basis in support of their assertion that the Zeisel studies do not measure juror comprehension, respondents contend that Magistrate Judge Weisberg "apparently misunderstood [Lavrakas'] testimony regarding factor analysis and the Cronbach Alpha calculation he performed on the Zeisel data." Respondents' Objections to Report and Recommendation at 8. We disagree. Both factor analysis and Cronbach's Alpha calculation are means of depicting patterns of consistency in correct and incorrect answers to the survey questions. One of the theoretical assumptions underlying these analyses, however, is that the data to be examined must be continuous as opposed to binary or dichotomous. Transcript at 774–76, 1176–86 (testimony of Prof. Rossi); Transcript at 1085–89 (testimony of Prof. Diamond); Transcript at 844, 865–66, 926, 1221–24 (testimony of Prof. Lavrakas). Further, it is undisputed that multi-dimensional questions reduce factorial consistency. Transcript at 929, lines 10–12 (statement of Prof. Lavrakas). As the Zeisel survey data are in fact binary and the questions are multi-dimensional, Magistrate Judge Weisberg properly concluded that neither factor analysis nor Cronbach's Alpha calculation undermined the construct validity of the Zeisel studies.

## C. *Generalization of Zeisel's Results to Others*

Respondents' attack on the reasonableness of applying the Zeisel survey results to persons other than the survey respondents is threefold. First, respondents contend that it is improper to draw conclusions about the universe sampled from, *i.e.,* all eligible jurors in Cook County, because Free has not demonstrated the representativeness of the samples. Second, respondents argue that, assuming the samples were representative of all eligible Cook County jurors, Free was convicted and sentenced in DuPage County and generalization outside the relevant universe is inappropriate in this case. Finally, respondents maintain that the survey conditions did not approximate a real-world setting and, as such, the results provide no insight into the endeavors of the *Free* jury. We address each issue seriately.

### 1. Representativeness of Survey Sample

As noted by respondents, general difficulties may arise when a researcher depends on limited data from samples to answer general questions about populations. It is axiomatic that samples ordinarily are not identical to the populations from which they come. Hence stems the concept of sampling error, *i.e.,* the difference between a sample and its population. Further, samples themselves are variable. For instance, if we were to take two samples from the same population, the composition of those samples will differ, as will the results generated. Nonetheless, we can be reasonable assured that a sample is representative of its population if (1) it is obtained by a process of random sampling, and (2) it is sufficiently large. *See* Frederick J. Gravetter & Larry B. Wallnau, *Statistics for the Behavioral Sciences* 174, 201–03 (1985).

That the survey samples were randomly selected is supported by the overwhelming weight of the evidence. A random sample is one in which each individual in the population has an equal chance of being selected.[7] Fredrick J. Gravetter & Larry B. Wallnau, *supra,* at 174; *see also* Hans Zeisel, *The Uniqueness of Survey Evi-*

---

7. Additionally, a random sample generally must meet a second requirement: "If more than one individual is to be selected for the sample, there must be constant probability for each and every selection." Fredrick J. Gravetter & Larry B. Wallnau, *supra,* at 174. To keep the probabilities from changing from one selection to the next, one must replace each sample before the next selection is made. However, in large populations, such as all potential jurors in Cook County, the requirement of replacement becomes unimportant as the probabilities stay essentially the same regardless of whether the sample is replaced. *Id.* at 175. For instance, a probability of 1 out of 1,000,000 is not noticeably different from a probability of 1 out of 999,999.

*dence,* 45 Cornell L.Q. 322, 327 (1960). Professor Zeisel testified that, to ensure a random sample, he used actual jurors called to service at the Daley Center on the days that the surveys were administered. Transcript at 19, lines 10–13. Further, according to the uncontradicted testimony of attorney James Bailinson, the survey respondents were grouped by jury officials in the same manner as those jurors sent to courtrooms for actual jury service. Upon arriving at the Daley Center, the potential juror handed in her summons and pulled from a basket a folded up piece of paper which contained a panel number. Transcript at 1045, lines 9–12 (statement of James Bailinson). Once the juror received her panel number, she waited in Room 1700 of the Daley Center until her panel number was called. Transcript at 1045, lines 16–21 (statement of James Bailinson). Zeisel and his assistants "were given jurors from the assignment room just as the judges would get in batches from there." Transcript at 23, lines 20–22 (statement of Prof. Zeisel). Such a random sampling procedure is not only representative, but appears to be as good a probability sample of potential Cook County jurors that could be designed. *See* Transcript at 23, lines 23–24 (statement of Prof. Zeisel).

The law of large numbers states that the larger the sample size, the more probable that the sample mean will be close to the population mean. Fredrick J. Gravetter & Larry B. Wallnau, *supra,* at 202. After removing those jurors who did not meet the requirements of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the April 1990 survey sample consisted of 96 potential jurors, and the January 1992 survey sample included 95. According to Professor Zeisel, any concern that the sample size was too small to be representative is allayed not only by computation of a confidence interval for each question, but also by the results of a split-half reliability analysis. Transcript at 36, lines 10–23. Zeisel essentially divided the samples from each survey into two halves as they arrived in seriatim and treated

them as independent samples. As a comparison of the answering patterns for the two half samples of each survey revealed that they were nearly identical,[8] we can conclude, and respondents have not rebutted, that the sample sizes were sufficiently large to ensure that the samples were representative of the population. *See* Transcript at 37, lines 5–15 (statement of Prof. Zeisel); *see also* Transcript at 727, lines 4–5 ("I feel that the sample size is adequate to infer about the population at large.") (statement of Prof. Rossi).

### 2. Generalization to DuPage County Jurors

Based on demographic differences between the survey samples, the *Free* jury and the populations of Cook and DuPage Counties as to gender, age, education level and race, Professor Lavrakas opined that the results of the Zeisel surveys cannot be extrapolated to the *Free* jury, a group falling outside the surveyed population. However, assuming that such demographic differences in fact exist, Free has presented compelling evidence that these variables are irrelevant to jurors' ability to comprehend the jury instructions.

Respecting differences in educational level, Professor Hans testified that the survey data demonstrate "fairly high levels of miscomprehension of the judicial instructions. And the kinds of educational differences that the researcher have discovered I don't think could really influence that conclusion." Transcript at 168, lines 2–6. Finding a uniform pattern of consistent failure to answer the questions correctly and fairly even dispersion across the types of answers with no systematic subgroup scoring better or worse, Professor Rossi concluded that the Zeisel data can be applied to the *Free* jury with high levels of confidence. Transcript at 645–651. The opinions of Professors Hans and Rossi are bolstered by the results of an independent study conducted by Professor Diamond and Jonathan Casper. The Diamond–Casper study in part tested juror comprehension of the

---

**8.** The results of Zeisel's split-half reliability analyses for the April 1990 and January 1992 surveys are attached to this opinion as Appendixes D and E respectively.

IPI instructions, finding a high rate of incorrect answers to questions concerning aggravating and mitigating factors.[9] Significantly, the study accounted for differences in scores by college and noncollege graduates, showing that college graduates maintained a high rate of miscomprehension and that the margin of improvement associated with a college education was relatively small. Transcript at 308–310 (testimony of Prof. Diamond).

Likewise, Free presented substantial evidence that gender plays no role in jurors' comprehension of the instructions. *See* Transcript at 191, lines 6–10 ("So if our sample contained more women than were in Cook County or DuPage County, whatever, I would say, well, here is an instance where that's not going to influence materially the results. Because there isn't that link in advance between gender and comprehension levels.") (statement of Prof. Hans); Transcript at 1125, lines 7–10 ("In terms of their probability of getting an answer correct or incorrect, there is no evidence from these data that would lead you to conclude that there is a difference [between men and women] in getting these questions right.") (statement of Prof. Diamond). Further, based on his tabulation of the survey results by gender, Lavrakas conceded that there is "no consistent pattern in women answering differently than men." Transcript at 953, lines 6–7.

Lavrakas' speculation that age may affect comprehension is unsupported by the evidence adduced at the hearing. Indeed, Lavrakas "did not tabulate the survey data by age and agreed that he had no empirical evidence suggesting that older people would be better able to comprehend the jury instructions than younger people." Report and Recommendation at 16; Transcript at 954–55 (testimony of Prof. Lavrakas). To the contrary, Free's expert witnesses testified that based on the survey data, there is no correlation between age and comprehension of the jury instructions.

*See, e.g.,* Transcript at 1080, lines 5–16 ("out of the 17 questions, older people were less accurate on average on eleven of them, and they were more accurate on six of them. Overall I would say ... there is no difference.") (testimony of Prof. Diamond).

Finally, regarding racial demographics, Professor Diamond discovered that, of white survey respondents, less than fifty percent answered correctly on twelve of seventeen questions, suggesting an extraordinarily high level of misunderstanding on each of the five measured issues. Transcript at 1081–83. As Free was tried by an all white jury, it follows that differences in racial composition are irrelevant to the issue of whether the Zeisel data may properly be applied to the *Free* jury. In any event, Professor Rossi testified that he could not detect a relationship between race and comprehension. Transcript at 1189–91. Further, Lavrakas "ultimately agreed that race as a variable was not important in determining comprehension level." Report and Recommendation at 17; Transcript at 1225–1227.

We are mindful of the possibility of a "Type II error," that is failing to reject a false hypothesis. However, as explained by Professor Diamond, because a Type II error assumes a difference in effect that goes undetected, we can never know the probability that such an error is being made in concluding that the demographic differences in question are irrelevant to comprehension. Transcript at 1125–26. Professor Diamond continued to state that although it is "hypothetically" possible, "there is nothing in the data to support the notion that a Type II error is being made." Transcript at 1126, lines 5–7. Accordingly, merely raising the possibility of a Type II error is insufficient on the part of respondents to rebut Free's showing that no correlation exists between the various demographic differences and juror comprehension. As such, we agree with Magistrate Judge Weisberg's conclusion that "if the

---

**9.** Respondents assert that because this study differed in several ways from the Zeisel studies, it was not properly before Magistrate Judge Weisberg. We disagree. Professor Diamond testified in great detail about the design of the study, and respondents did not challenge its statistical validity. That it shows high levels of misunderstanding on issues tested in the Zeisel studies makes it more probable than not that the Zeisel surveys are valid.

same survey instruments were used with prospective jurors in the DuPage County Courthouse under conditions like those in the Daley Center surveys, it is reasonable to expect similar results showing substantial levels of misunderstanding of the IPI instructions and the capital sentencing instructions used in the *Free* case." Report and Recommendation at 21.

### 3. Mundane Realism

In support of their claim that the survey data may not be applied properly to the *Free* jury, respondents further argue that the Magistrate Judge "ignored Dr. Lavrakas' testimony on 'mundane realism,' that is, the extent to which the Zeisel survey conditions approximated the 'real world.'" Respondents' Objections to Report and Recommendation at 18. We begin with the observation that Professor Lavrakas admittedly is not an expert in juror comprehension, nor has he read any of the literature concerning jury research. *See* Transcript at 808–823 (voir dire of Prof. Lavrakas). As such, it is ironic that respondents challenge the substance of the testimony of Free's experts solely on the basis of Lavrakas' speculation regarding issues of juror dynamics and comprehension. Nonetheless, Magistrate Judge Weisberg recognized that the *Free* jury differed from the Zeisel survey respondents in three important ways:

> [1] They made an actual life or death decision, [2] they deliberated as a group instead of separately answering written questionnaires and [3] they made their decision after a trial and sentencing hearing in which they heard aggravating and mitigating evidence and arguments by the prosecutor and Free's attorney which discussed how the jury should decide on the sentence.

Report and Recommendation at 21. Accordingly, it is incumbent upon this court to consider the likely impact of these differences in conditions upon juror comprehension despite the lack of any competent testimony offered by respondents on the matter.

The gravamen of respondents' first assertion is that because the *Free* jurors made an actual life or death decision they were more "motivated" than the survey respondents who were merely taking a pencil and paper test. Indeed, there is no dispute that the *Free* jurors likely were more "motivated" in determining if death was the most appropriate sentence. In other words, jurors asked to pass ultimate judgment over another's life will no doubt participate in an inner conflict requiring them to balance personal notions of morality and their perceived obligations to the legal system. Such emotional turmoil clearly was not present in the Zeisel studies. As pointed out by Professor Zeisel, however, whether the jurors reached the "correct" result as a matter of personal morality and whether the jurors comprehended and followed the judicial instructions are two different questions, Transcript at 22–23—the relevant issue for our purposes, and the issue designed to be studied by the Zeisel surveys, being the latter.

Acknowledging the difference in emotional state between the *Free* jury and the survey respondents, Free's experts testified that empirical research demonstrates that intensity and emotions eclipse the cognitive abilities necessary for comprehension of such complex instructions. *See, e.g.,* Transcript at 441–42 ("One of the difficulties is that when people are emotionally overwrought—and I guess what you were trying to say is that they are heavily emotionally involved—it sometimes cuts against comprehension.... high emotional level interferes with comprehension.") (testimony of Prof. Diamond); *see also* Loftus, *Eyewitness Testimony* (1979) (emotions and intensity impair cognitive functions) (cited below by Free's experts). Further, Professor Diamond testified that the conditions afforded the survey respondents provided a superior environment for comprehension than did the conditions in *Free*, particularly because the survey respondents not only had the instructions read to them, but also had a written copy for reference while answering the survey questions. Transcript at 1146–47. In light the uncontradicted evidence, we concur in Magistrate Judge Weisberg's conclusion that such factors as "motivation" and "emotion" do not enhance juror comprehension, and that the survey respondents did not participate in

an actual life or death decision does not undermine the results of the Zeisel surveys as applied to the *Free* jury.

Respecting the effect of deliberation and closing arguments upon juror comprehension, Magistrate Judge Weisberg found that "the evidence is not strong enough to rule out the possibility that comprehension among members of the *Free* jury on some key issues may have been substantially aided by hearing the evidence, the arguments of the attorneys and by the process of deliberation." Report and Recommendation at 24. After a careful review of the testimony of Professors Zeisel, Transcript at 37–41, 91, Hans, Transcript at 156–166, 221–22, and Diamond, Transcript at 306–07, we agree that the effect of these factors can only be assessed in conjunction with an analysis of the issues on which a likelihood of misunderstanding is claimed. Accordingly, we will revisit these factors *infra* Section III of this opinion.

### D. *Volatility*

Respondents maintain that a comparison of the 1992 survey results with the confidence intervals predicted on the basis of the 1990 survey demonstrates a mark of inconsistency or "volatility." We disagree.

More than one confidence interval was calculated on the basis of the 1990 survey. Professor Zeisel calculated 95% confidence intervals based on percentages of incorrect answers, while Professor Rossi calculated 99% confidence intervals based on percentages of correct answers. Each eliminated those questions for which no correct answer existed (questions 1, 13, 14, 15 and 16), as well as question 6, which was not included in the 1990 results because of a typographical error. Comparing the 1992 results to the Zeisel intervals, "the 1992 results fell within the predicted confidence intervals for 3 questions, fell slightly outside (1% to 2%) for 2 questions, outside by 4% to 6% for 3 questions and outside by 9% to 12% for 2 questions." Report and Recommendation at 17–18. "Using Rossi's confidence intervals, the 1992 results fell within predicted confidence intervals for 3 questions, slightly outside for 1 question, outside by 5% to 8% for 5 questions, and outside by 12% for 1 question." *Id.* at .18.

As an empirical matter, we agree with Magistrate Judge Weisberg and Professor Rossi that the levels of deviation in the 1992 survey from the results predicted on the basis of the 1990 survey (*i.e.*, the confidence intervals) are "modest." Report and Recommendation at 18; Transcript at 763, lines 13–14 (testimony of Prof. Rossi). According to Professor Rossi, that the two surveys were not identical accounts for this modest deviation. Transcript at 770–73. Indeed, the predictive quality of the confidence interval rests on the assumption of identical surveys being given under identical conditions. In any event, the fact that both surveys, with few exceptions, depict very high levels of misunderstanding buttresses the Magistrate Judge's conclusion that the surveys are valid and reliable.

### III. The Impact of the Zeisel Survey Results on *Free*

In determining the impact of the Zeisel data on Grounds 5, 10 and 14 of Free's petition for habeas relief, this court is guided by the holding in *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990), that when presented with a claim that a capital sentencing instruction is ambiguous and therefore subject to an erroneous interpretation, the relevant inquiry is

> whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such inhibition.

With this standard in mind, we turn to consider the conclusions to be drawn from the Zeisel survey results respecting each of the measured aspects of juror comprehension.

A. *Existence of a Mitigating Factor*

■ Designed to test whether jurors believe they must agree unanimously on the existence of a mitigating factor before that factor can be considered by an individual juror, questions 4 and 5 of the Zeisel surveys provide as follows:

> 4. A juror decides that the fact that Mr. Wood was only 25 years of age when he committed the murder is a mitigating factor sufficient to preclude the death penalty. However the other eleven jurors disagree and insist that his age is not a mitigating factor. The one juror believes that she cannot consider a mitigating factor unless the entire jury agrees upon it and votes for the death penalty. She votes for the death penalty.
>
> 5. A juror decides that the fact that Mr. Woods was good to his family is a mitigating factor sufficient to preclude the death penalty. However, the other eleven jurors disagree. The other jurors insist that no juror should consider the defendant's good relations with his family as a mitigating factor unless they all agree it is a mitigating factor. The one juror accepts this approach and votes for the death penalty.

The state of the law is clear: instructions which a reasonable juror could interpret as allowing individual jurors to consider only mitigating factors that the jury unanimously find violate the Eighth Amendment. *Mills v. Maryland,* 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988); *see also McKoy v. North Carolina,* 494 U.S. 433, 435, 110 S.Ct. 1227, 1229, 108 L.Ed.2d 369 (1990). Accordingly, a response that the jurors in questions 4 and 5 followed the judicial instructions is incorrect. In the 1990 survey, 25% and 36.5% of the subjects respectively answered question 4 and 5 incorrectly.[10] After substituting the actual *Free* instructions in the 1992 survey, 14.7% of the subjects answered

question 4 incorrectly, while 30.5% answered question 5 incorrectly. Finding that the deliberative process, as well as the attorneys' closing arguments, would have provided a jury with assistance on the matter, Magistrate Judge Weisberg concluded that Free failed to demonstrate "a reasonable likelihood that either jurors generally or the jurors in his case would have misunderstood the instructions as requiring unanimous agreement on the existence of mitigating factors, precluding individual jurors from considering relevant mitigating evidence." Report and Recommendation at 30–31. Free strenuously objects to this conclusion.

■ We begin our analysis by noting that to the extent that only one of the *Free* jurors (the absolute minimum according to the 1992 survey results) misunderstood the law, then this court would be compelled to conclude that "the jury [as a whole] has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380, 110 S.Ct. at 1198. This repercussion follows from the fact that the law affords independent authority to consider mitigating factors and, as such, any one juror could preclude the imposition of the death penalty. Nonetheless, in order to demonstrate a reasonable likelihood that at least one juror misunderstood the instant point of law, Free bears the burden of demonstrating that neither deliberation nor the attorneys' closing arguments would improve comprehension respecting the unanimity issue. In the instant context, we, like the Magistrate Judge, believe that Free has not carried this burden.

Respecting the likely effect of the closing arguments, Free contends that the passages relied upon by the Magistrate Judge do not speak to the issue of unanimity, but rather on the weight to be given mitigating factors once established.[11] Petitioner's Ob-

10. Professor Zeisel's calculations of the confidence intervals for each question on the 1990 and 1992 surveys are attached to this opinion as Appendixes F and G.

11. Free notes, not without some force, that in determining the likely effect of attorney state-

ments on jurors, courts often place great weight on the notion that "arguments of counsel generally carry less weight with a jury than do instructions from a court." *Boyde,* 494 U.S. at 384, 110 S.Ct. at 1200. Given the explicit admonishment to the jury that "the attorney' argu-

jections to Report and Recommendation at 2–3. Indeed, it appears that this is the case for two of the three passages. First, Magistrate Judge Weisberg relied on defense counsel's remarks that:

> There is no hung jury, so to speak, in a capital situation.... [Y]ou are going to receive instructions that tell you very explicitly that all of you must agree, right down to the last one, unanimously, that there are no mitigating factors, there is nothing here in James Free of a mitigating nature *that reflect on the death penalty* before you can say to the Court—and your determination is mandatory—"your honor, sentence him to death."
>
> You all have to agree on that.
>
> Yet again, ladies and gentlemen, the other verdict form that you will receive says that we cannot unanimously agree.

Sentencing Transcript at C8417–18 (emphasis supplied). When asked whether this specific text "might have helped the Free jury understand the instructions that they were to receive," Professor Levi responded:

> Actually, it confused me as you were saying that—to hear what I thought was the defense attorney saying you are going to receive instructions that tell you very explicitly that all of you must agree that there are no mitigating factors.
>
> I mean, he takes a long time until he gets to something that undoes that.
>
> ... In other words, this sentence is confusing.

Transcript at 591, lines 8–17. Putting aside the incongruity of the defense counsel speaking of "no mitigating factors," it appears that this excerpt relates to the sufficiency of the evidence, not to the initial establishment of the mitigating factors. The second statement of Free's counsel relied on by Magistrate Judge Weisberg provides as follows:

Ladies and gentlemen, in the instructions you will find the statement that if one of you—just one of your twelve finds among all of this situation in the evidence that you have heard that the death sentence *should not be imposed*, if just one of you, the rest of you must respect that.

You must. That's the law.

That person or persons or group of you doesn't have to convince all of the others that the sentence not be imposed. Not at all.

After your due deliberations, if just one, two or three of you say, "I'm sorry, I find in James Free, and his background and in the circumstances, and in the law, that I am given a mitigating factor that *impresses me enough* not to give the death penalty," ladies and gentlemen, the rest of you must abide by that.

And in signing the verdict that says you cannot unanimously agree you are not saying, "we agree with that person."

You are merely saying, "One of our twelve, or more, cannot impose it because that person finds in this situation, from his or her own mind, conscience, background, values, that it not be imposed."

Sentencing Transcript at C8418–19 (emphasis supplied). Arguably this passage, as did the previous remarks, speaks to the sufficiency of the evidence, as opposed to whether an individual juror may consider a mitigating factor that all jurors do not agree exists.

Despite the ambiguities in the first two passages, however, the concluding statement of Free's attorney sufficiently conveys the idea that an individual juror may consider a mitigating factor regardless of whether there is unanimity over its existence:

---

ments are not evidence" and that "the court will now instruct you as to the law," Free asserts that "any potential force that the arguments might have had was entirely eviscerated by the court's instructions themselves." Petitioner's Objections to Report and Recommendation at 3. The Supreme Court, however, has cautioned that "the arguments of counsel, like the instruc-

tions of the court, must be judged in the context in which they are made." *Boyde*, 494 U.S. at 384–85, 110 S.Ct. at 1200. In parsing through the contextual relevance of each of the statements of Free's attorney, we are cognizant of the differing weights afforded by law to attorney arguments on the one hand and judicial instructions on the other.

I ask you now to·go back and to search these [mitigating factors?] and to search yourself and your mind and your heart and your individuality, and I submit that when you do that ... that you will say, *"There are mitigating factors, you are a person, I am not going to tell the court to sentence you to death."*

If any one or more of you feel that the way the other should respect that and sign the verdict [stating that you cannot unanimously find that there are no mitigating factors sufficient to preclude the death penalty].

Sentencing Transcript at C8438–39 (emphasis supplied). The above quoted passage differs from the previous two statements of Free's lawyer in two significant manners. First, the presence of the phrase "There are mitigating factors," coupled with the absence of such expressions as "impresses me enough," justifies an inference that the excerpt relates information helpful to the jury in the initial assessment of whether a mitigating factor exists. In other words, this statement, unlike the preceding two, expresses the power of the individual to find mitigating factors without conveying distracting ideas about the sufficiency of the evidence. Second, the text was the very last statement in the defense's closing argument, and was immediately followed by the judicial instructions. That the passage was not buried in the middle of the argument makes it more likely that the jurors actually remembered and relied upon it during their deliberation. *Cf.* Transcript at 578, lines 8–15 (statements made "way before the end of all the arguments" are not likely to be remembered) (testimony of Prof. Levi).

Likewise, we agree with Magistrate Judge Weisberg that deliberation most likely would improve a jury's understanding with respect to this issue. Based on the confidence intervals calculated for questions 4 and 5, we can safely conclude that a majority of the *Free* jurors understood the concept prior to deliberation. Once the issue is raised in deliberation, a virtual likelihood if in fact some jurors are seeking to establish unanimity on the existence of a mitigating factor, it is reasonable to assume that the majority opinion will prevail. *See* Transcript at 39, lines 7–13 (For whatever reason, whether it be "a deeply ingrained respect for majority rule in a democratic society, or because of the thought where if more people think so than I, they must be right, or whether they just want to go home, ... the essence of the deliberative process [is] that the majority wins over the minority.") (testimony of Prof. Zeisel).[12]

In sum, because Free has failed to demonstrate that neither deliberation nor the attorneys' closing arguments would improve comprehension on the instant concept, we cannot conclude that there is a reasonable likelihood that any member of the *Free* jury interpreted the instructions as requiring unanimous agreement on the existence of mitigating factors.

B. *Non–Statutory Mitigating Factors*

▉▉▉▉ The Eighth Amendment requires that a capital sentencing scheme place no restrictions on the type of mitigating circumstances that the sentencer can consider. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). As such, the sentencer's consideration should not be limited to statutorily recog-

---

**12.** Free's argument that "deliberation would have a very slight, if any, impact on enhancing comprehension on the part of jurors," rests on the findings of two empirical studies: the Diamond–Casper study and a study performed by Professor Phoebe C. Ellsworth. However, contrary to Free's assertion, the results of these studies are "sketchy and inconclusive." Report and Recommendation at 24. The Diamond–Casper study produced a mixed fallout: in some cases deliberation resulted in a modest improvement in accuracy, while precision associated with deliberation actually dropped in one case out of seven. Transcript at 306, lines 4–8 (testimony of Prof. Diamond). The Ellsworth study, *Are Twelve Heads Better Than One?,* 52 Law & Cont.Prob. 205 (1989), suggests that jurors frequently correct each others' factual errors but are less likely to correct errors about judicial instructions. Professor Ellsworth, however, cautioned that because of the small sample size in her study, statistical analysis of the data would be misguided. *Id.* at 208. Further, the deliberating groups in that study confronted issues of guilt or innocence and operated under a one hour time limitation which Ellsworth thought probably resulted in an incomplete picture of the deliberation process. *Id.*

nized mitigating circumstances. To test juror comprehension respecting this point of law, Professor Zeisel included in his surveys the following questions: [13]

2. A juror is persuaded that the fact that Mr. Woods was good as a boy is a mitigating factor sufficient to preclude the death penalty. However, she notes that being a good child is not one of the mitigating factors which the judge specifically mentioned. She also believes that being a good child is not an excuse for the murder which is comparable to the other mitigating factors which the judge specifically mentioned. For this reason, she concludes that she has no choice and must vote for the death penalty.

6. A juror decides that Mr. Woods was not under the influence of an extreme emotional disturbance when he committed the murder, but that he did suffer from a mild emotional disturbance at the time of the murder. She concludes that the judge's instructions required that an emotional disturbance be an "extreme" disturbance in order to be a sufficient mitigating factor, and thus a mild emotional disturbance cannot be a mitigating factor sufficient to preclude death. She votes for the death penalty.

7. A juror decides that the fact that Mr. Woods did not kill more than one person is a reason sufficient not to sentence him to death. However, she also concludes that this fact is not one of the mitigating factors which the judge specifically mentioned. She also does not believe this fact provides a reason to spare the defendant's life that is comparable to any with the mitigating factors which the judge specifically mentioned. She concludes that as a result she must vote for the death penalty and does so.

8. A juror decides that the fact that Mr. Woods did not actually rape either of the women is a mitigating factor sufficient to preclude the death penalty. She votes against the death penalty.

9. A juror decides that Mr. Woods had a significant criminal record. However, the juror also concludes that the fact that none of Mr. Woods prior crimes was violent is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

10. A juror decides that Mr. Woods will never be rehabilitated to useful citizenship. But she also decides that Mr. Woods may be rehabilitated enough to be a safe and obedient prisoner. She concludes that this is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

11. A juror decides that the fact that Mr. Woods very much regretted what he did is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

The hypothetical jurors in questions 2, 6 and 7 identified mitigating factors which they believed were sufficient to preclude the death penalty. However, because those mitigating factors were neither specifically mentioned by the judge nor similar in nature to those that were listed, the hypothetical jurors vote for the death penalty. Under these circumstances, a response that the hypothetical jurors in questions 2, 6 and 7 followed the judge's instructions is incorrect. Questions 8, 9, 10 and 11 set forth hypothetical jurors who find non-statutory mitigating factors sufficient to preclude the death penalty and, as such, vote against death. As these hypothetical jurors in fact followed the judicial instructions, a response that they did not is incorrect. The percentage of incorrect responses to each of these questions is summarized below for both the 1990 and 1992 Zeisel surveys:

| Question # | 1990 Survey | 1992 Survey |
| --- | --- | --- |
| 2 | 56.3% | 40% |
| 6 | ——[14] | 58.9% |
| 7 | 64.6% | 50.5% |
| 8 | 65.6% | 51.6% |
| 9 | 46.9% | 38.9% |
| 10 | 58.3% | 57.9% |
| 11 | 67.7% | 56.8% |

**13.** Question 1 is eliminated from this list, as it undisputedly is ambiguous.

**14.** A typographical error invalidated this question in the 1990 Zeisel survey.

The magnitude of these results are staggering, indicating that a majority of the *Free* jury likely believed that only those mitigating factors specifically listed by the judge, or factors comparable to them, could preclude the imposition of the death penalty. Given a reasonable probability that the majority of jurors are misled, Magistrate Judge Weisberg concluded that deliberation would not have helped a jury overcome the misconception. Report and Recommendation at 32. Further, he concluded that the remarks of Free's attorney at closing would not have "made it clear to Free's jurors that they were free to consider anything that they considered mitigating, whether or not it was somehow related to one of the statutory factors told to them by the judge." *Id.* at 35. Respondents object to the Magistrate Judge's conclusions, insisting (1) that the closing arguments cured the *Free* jury of any miscomprehension, and (2) that any confusion would have been cured during the deliberative process.

In his closing remarks, the prosecutor stated:

> But you are not limited to those two [statutory factors], and you are not limited to aggravating factors. This is, to be somewhat colloquial, a pretty wide open consideration.
>
> It is important that it is because this is a consideration that you as humans are making based on the facts of this case and it should be a very wide open situation.
>
> So anything which the Defendant would offer in this case which truly provides a reason for imposing a less severe sentence should be considered by you if it does do that.
>
> And anything which truly provides a reason for imposing a greater sentence, or more severe sentence, should also be considered by you.
>
> That is, I submit, a very important procedural aspect in the case.
>
> I will talk to you about some of those, but you will probably be able, between yourselves, to think of some that I won't even mention, that maybe I haven't even thought of.

> So you should keep in mind that although we don't mention them there may be factors in your own mind that although we don't mention them there may be factors in your own mind that you will wish to consider in this respect, and you should.

Sentencing Transcript at C8366–67. Although this statement conveys the notion that non-statutory mitigating factors properly may be considered, Professor Levi cautioned that the context of this statement makes it difficult to remember. Transcript at 582, lines 21–22. Indeed, this statement comes at the beginning of the prosecutor's remarks and is followed by both the defendant's closing argument and the judicial instructions. In any event, we agree with the Magistrate Judge's assessment that the extent to which this excerpt may have assisted the *Free* jury was completely eviscerated by the closing statement of Free's attorney. *See* Report and Recommendation at 33–35 (concluding that defense counsel's attempt to list non-statutory mitigating factors would not have improved the ability of Free's jurors to understand the issue at hand because (1) his presentation was extraordinarily confusing and discontinuous, and (2) some of the factors raised were closely related to the statutory factors). In light of Magistrate Judge Weisberg's careful and thorough line-by-line analysis of the defense attorney's comments, we will not belabor the point here.

Likewise, we agree with the Magistrate Judge's conclusion that deliberation would not have helped a jury overcome the misconception that they could consider only mitigating factors listed by the judge, or factors related to them. As stated by Magistrate Judge Weisberg:

> It is not difficult to see the source of this misunderstanding. The IPI instructions state that mitigating factors include the five factors listed in the statute and "any other reason supported by the evidence why the defendant should not be sentenced to death." The *Free* jury was told that "mitigating factors include, but are not limited to, the following circumstances." The test subjects, and the *Free* jury, may have wondered why, if

they could consider anything at all in mitigation, the judge instructed them on only specified items. As Dr. Levi testified, when people are presented with a category with which they are not familiar (e.g., "mitigating circumstances") they will look for examples for guidance. Transcript at 518, 541, 543–44. Trying to make sense out of the instructions, a jury could reasonably conclude that while there could be other mitigating factors, they would have to be similar in some way to the listed ones—the same common-sense idea underlying the doctrine of *ejusdem generis.* Here intelligent deliberation might well lead them to the wrong answer.

Report and Recommendation at 32 (footnote omitted). Respondents have offered no evidence, adduced at hearing or otherwise, to undermine the well-supported and thoughtful conclusion of Magistrate Judge Weisberg.

█ As a final matter, respondents argue that it is unlikely that reasonable jurors would believe the court's instructions transformed the evidence in mitigation regarding Free's good reputation, work record, military history and non-violent character "into a virtual charade." *See Boyde,* 494 U.S. at 383, 110 S.Ct. at 1199. In *Boyde,* the petitioner argued that the catch-all factor contained in the list of mitigating factors, which provided that the jury should consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," yielded a reasonable likelihood that his jury believed they could not consider mitigating evidence of background and character. The Supreme Court rejected Boyde's claim, stating:

All of the defense evidence presented at the penalty phase—four days of testimony consuming over 400 pages of trial transcript—related to petitioner's background and character, and *we think it is unlikely* that reasonable jurors would believe the court's instructions transformed all of this "favorable testimony into a virtual charade." The jury was instructed that it *"shall consider all of the evidence* which has been received

during any part of the trial of this case," and in our view reasonable jurors surely would not have felt constrained by the factor (k) instruction to *ignore all* of the evidence presented during the sentencing phase.

*Id.* at 383, 110 S.Ct. at 1199–1200 (citations omitted) (initial emphasis supplied, following emphasis in original). In rejecting respondents' argument below, Magistrate Judge Weisberg convincingly distinguished the facts of *Free* from those of *Boyde:*

[Free's counsel] offered testimony of Free's good reputation, work record, military history and non-violent character. This would have been relevant to the statutory mitigating factor of emotional disturbance—which Free's counsel argued, without objection, was applicable to Free's claim that he was intoxicated at the time of the crime. The testimony showed that Free's normal self was not violent; therefore he must have been suffering from a mental disturbance when he murdered Bonnie Serpico.

Because much of the evidence would have been arguably relevant to a statutory mitigating factor, Free's jury was not in the same position as the jury in *Boyde;* If Free's jury believed that mitigating factors were limited to statutory ones or something closely resembling them, the presentation of evidence of his work history and personality would not have appeared to have been a waste of time. Without having to face the contradiction, the jury would not have been forced to correct its misunderstanding.

Report and Recommendation at 35–36. More to the point, however, to the extent that *Boyde* was sufficiently analogous to the present case, the Supreme Court rejected Boyde's claim based entirely on judicial speculation as to how the jurors in that case viewed the background evidence. *See Boyde* 494 U.S. at 383, 110 S.Ct. at 1199 (*"we think it unlikely* that reasonable jurors would believe the court's instructions transformed all of this "favorable testimony into a virtual charade") (emphasis supplied). While such judicial speculation would have provided guidance in the ab-

sence of empirical data on the matter, Free has presented overwhelming empirical evidence indicating that it is reasonably likely that his jury in fact summarily rejected all evidence regarding nonstatutory mitigating factors. Under such circumstances, Free's sentence cannot stand.

## C. *The Proper Verdict For a Non–Unanimous Jury*

To comply with the mandate of the Eighth Amendment, the Illinois death penalty statute requires that the jury unanimously agree that the defendant should be sentenced to death. *See* Ill.Rev.Stat. ch. 38, ¶ 9–1(g) (Supp.1992) ("If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death."). As a necessary corollary, if the jury does not unanimously agree to impose the death penalty, they must sign the verdict form stating that they "do not unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence," and the defendant is sentenced to a term of years. *See id.* ("Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections."). In other words, a hung jury in the sentencing phase of a capital case does not result in the convening of another sentencing hearing. To test juror comprehension on this point of law, Zeisel included in his surveys the following question:

16. After deliberating for two days, nine jurors are convinced that death should be imposed. Three jurors believe that death should not be imposed. The jurors are all convinced that they will not change their mind. Read the following three statements and check the one which best describes, under the judge's instruction, what the jury should do: (a) All sign the verdict form "we, the jury unanimously find that there are no mitigating factors sufficient to preclude the imposition of a death sentence." (b) All sign the verdict form, "we, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence." (c) Tell the judge they cannot reach a unanimous verdict.

The results of the 1990 survey are as follows: 6.3% of the survey respondents checked (a), 40.6% answered (b), 51% marked (c) and 2.1% did not respond. In response to question 16 on the 1992 Zeisel survey, 2.1% of the survey respondents answered (a), 42.1% marked (b) and 55.8% checked (c). Free contends that the data indicate a reasonable likelihood that the *Free* jury operated under the assumption that a deadlock meant another sentencing hearing would be convened. As such, Free surmises that the jury felt additional pressure to reach a unanimous decision, and that this additional pressure most probably led minority jurors who were inclined to vote against the death penalty to lose resolve and vote in favor of death. We, like Magistrate Judge Weisberg, disagree.

As an initial matter of practical consequence, question 16 is potentially ambiguous. While (a) is clearly an incorrect response, and there can be no doubt that (b) is correct, interpreting an answer of (c) proves more difficult. Indeed, as noted by the Magistrate Judge, (c) may be a correct answer "since the inability to reach a unanimous verdict is equivalent to a decision against the death penalty." Report and Recommendation at 37. More significantly, the *Free* jury enjoyed two advantages over the survey respondents respecting comprehension of the instant issue. First, during closing argument, Free's attorney stated:

There is no hung jury, so to speak, in a capital situation.... [Y]ou are going to receive instructions that tell you very explicitly that all of you must agree, right down to the last one, unanimously, that there are no mitigating factors, there is nothing here in James Free of a mitigating nature that reflect on the death penalty before you can say to the Court—and your determination is mandatory—"your honor, sentence him to death."

You all have to agree on that.

Yet again, ladies and gentlemen, the other verdict form that you will receive says that we cannot unanimously agree.

Sentencing Transcript at C8417–18. Second, to aid in their deliberation, the *Free* jury possessed the two verdict forms. Respecting these two differences, Professor Hans testified:

There was a section in which the defense attorney very eloquently talked about there being no hung jury in a penalty phase decision making situation.

And that fact and the fact that, unlike this case, the real jury would have had the verdict forms in front of them, the two verdict forms, verdict form A and verdict form B, to me suggested that question 16 might not apply to the Free jury.

That in that particular case, those extra cues, the cue from the attorney, saying there is no hung jury—that is, you know, that that was another way of telling them, you know, it's verdict form A or verdict form B.

And then their presence in the jury room of just the two verdict forms, one of which said the unanimity and the other said nonunanimity, might have suggested to them that—or might have indicated to them the "correct" answer B, that they had to sign one of the two verdict forms.

Transcript at 156, lines 1–17. Viewing the jury instructions in context and together with the remarks during the defense's closing argument, we conclude that Free has failed to demonstrate a reasonable likelihood that the sentence in his case was based on whatever misunderstandings are reflected by the responses to question 16.

### D. *The Burden of Persuasion* [15]

 As noted by Magistrate Judge Weisberg, questions of (1) which side shoulders the burden of persuasion on the appro-priate sentence, and (2) what is the nature of that burden, have perplexed both courts and juries over the recent past. Report and Recommendation at 43 n. 13. The Illinois Supreme Court recently clarified the issues, declaring that the State and the defendant bear the burden of coming forward with aggravating and mitigating evidence respectively, after which the jury engages in a process of balancing with neither party having a burden of proof. *People v. Simms,* 143 Ill.2d 154, 184, 157 Ill.Dec. 483, 495, 572 N.E.2d 947, 959 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992); *People v. Thomas,* 137 Ill.2d 500, 538, 148 Ill.Dec. 751, 767, 561 N.E.2d 57, 73 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1092, 112 L.Ed.2d 1196 (1991). At the threshold, we note that Free does not challenge the constitutionality of the approach as described by the Illinois Supreme Court. Indeed, it appears that, had the State of Illinois so desired, it could have placed the burden of persuasion on the defendant. *See Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 3055, 56, 111 L.Ed.2d 511 (1990) ("So long as the State's method of allocating the burdens of proof does not lessen the State's burden ... to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.") (opinion of White, Rehnquist, O'Connor and Kennedy, JJ.). Instead, the gravamen of Free's claim is that, no matter where the burden of persuasion is allocated (*i.e.,* upon the State, the defendant or neither) and no matter what the nature of that burden, the statute and jury instructions must communicate clearly the applicable standards. To the extent that the jury is left with no guidance as to (1) who, if anyone, bears the burden of persuasion, and (2) the nature of that burden, the Illinois scheme violates the Eighth Amend-

---

**15.** In response to question 3, designed to test whether jurors believe that the presence of a statutory mitigating factor automatically precludes the death penalty, 63.2% of the 1992 survey respondents and 43.8% of those in 1990 answered incorrectly. Magistrate Judge Weis-berg concluded that "the significance of this evidence is that it offers some support for the conclusions we reach below about the 'sufficient to preclude' language and burden of persuasion issue." Report and Recommendation at 37. Neither party objects to this mode of analysis.

ment's protection against the arbitrary and capricious imposition of the death penalty. *See Godfrey v. Georgia*, 446 U.S. 420, 427–28, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980) ("[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."); *see also Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens JJ.); *Furman v. Georgia*, 408 U.S. 238, 239–40, 92 S.Ct. 2726, 2727, 33 L.Ed.2d 346 (1972) (per curiam).

 Respecting their determination on the ultimate issue, the *Free* jury was instructed as follows:

> If, from your consideration of the evidence and after due deliberation, there is at least one of you who finds that there is at least one mitigating factor sufficient to preclude the imposition of the death sentence then you should return a verdict that the defendant should be sentenced to imprisonment.
>
> On the other hand, if from your consideration of the evidence and after due deliberation you unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence then you should return a verdict that the Defendant be sentenced to death.

Sentencing Transcript at C8443–44. Drawing on the phrase "sufficient to preclude the death penalty," respondents assert that the jury was adequately guided in making its sentencing decision. Respondents' Objections to Report and Recommendation at 45. We, like Magistrate Judge Weisberg, disagree.

Questions 13 and 15 were designed to test juror comprehension respecting who, if anyone, bears the burden of persuasion:

> 13. After hearing all of the evidence in this case, a juror is not persuaded one way or another as to whether there are or are not mitigating factors sufficient to preclude the death penalty. Because the juror has not found that there is a mitigating factor sufficient to preclude

death, the juror votes for the death penalty.

Has that juror followed the judge's instructions?

- 1992 Survey—Yes (50.5%); No (42.1%); Don't know (7.4%)
- 1990 Survey—Yes (62.5%); No (31.3%); Don't know (6.3%)

15. The jury in stage one found the defendant eligible for death. Which, if any, of the following four statements are correct and which if any are incorrect under the instructions given by the judge in this case:

(A) Once the jury finds the defendant is eligible for death, the prosecution must prove that mitigating factors do not exist; unless it does, the jury must vote against the death penalty.

- 1992 Survey—Correct (32.6%); Incorrect (58.9%); Don't know (7.4%)
- 1990 Survey—Correct (29.2%); Incorrect (62.5%); Don't know (8.3%)

(B) Once the jury finds the defendant is eligible for death, the defendant must prove that mitigating factors exist; unless he does, the jury must vote for the death penalty.

- 1992 Survey—Correct (49.5%); Incorrect (40.0%); Don't know (6.3%)
- 1990 Survey—Correct (45.8%); Incorrect (44.8%); Don't know (8.3%)

(C) Once the jury finds the defendant is eligible for death, the prosecution must prove that the death penalty should be imposed; unless it does, the jury must vote against the death penalty.

- 1992 Survey—Correct (36.8%); Incorrect (54.7%); Don't know (6.3%)
- 1990 Survey—Correct (37.5%); Incorrect (56.3%); Don't know (5.2%)

(D) Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that the death penalty should not be imposed; unless he does, the jury must vote for the death penalty.

- 1992 Survey—Correct (37.9%); Incorrect (54.7%); Don't know (6.3%)
- 1990 Survey—Correct (41.7%); Incorrect (51.0%); Don't know (7.3%)

As noted by Magistrate Judge Weisberg, the significance of the data summarized above is that "they show sharp disagreement about where the burden of persuasion lies." Report and Recommendation at 43. Further, that these results apply to the *Free* jury appears to be undisputed. Indeed, Magistrate Judge Weisberg found that:

> The *Free* jury received little more in the way of guidance than the subjects of the Zeisel studies. The prosecuting attorney at the beginning of his closing argument told the jury that the state no longer had a burden of proof, and that the death penalty was an "open question." Sentencing Transcript at C8362–63. This left unclear whether the burden was on the defendant or whether the jurors were to determine for themselves whether death or life was the default outcome. This statement came at the beginning of the prosecutor's summation; about eighty pages of argument, more than one hour (at about a page a minute) and a recess between closing arguments separated it from the beginning of the jury's deliberations.

Report and Recommendation at 44. Despite this explicit finding, respondents' pleadings are silent as to whether the *Free* jury would have been assisted by either closing arguments or deliberation, and we adopt the Magistrate Judge's conclusion. In the absence of any consensus among the test subjects, we find that neither the IPI nor the *Free* instructions provides adequate guidance on the issue of who, if anyone, bears the burden of persuasion.

Likewise, we concur with the Magistrate Judge's finding that the jury was given "virtually no guidance as to what the weight of that burden was, *i.e.*, what the 'sufficient to preclude' language meant." Report and Recommendation at 44. Consider the results to the following questions:

12. A juror considers all the evidence and comes to the conclusion that the mitigating evidence outweighs the aggravating evidence and that death is not appropriate. However, she cannot find a mitigating factor that is sufficient to *preclude* the death penalty. The juror votes for the death penalty.

14. A juror believes that what Mr. Woods did is terrible, but in her personal judgment it is not so terrible that he should be given the death penalty. However, on the other hand, she believes the mitigating evidence is no excuse whatsoever for what Mr. Woods did and that there are no mitigating factors sufficient to preclude the death penalty in this case. She votes for the death penalty.

If, as suggested by respondents, "sufficient to preclude" means that the jurors should weigh aggravating and mitigating evidence, the hypothetical jurors in each of the above questions did not follow the instructions. Nonetheless, in the 1992 survey, 35.8% and 55.8% of the survey respondents respectively believed that the jurors in question 12 and 14 followed the judicial instructions. Of the 1990 survey subjects, 58.3% and 75% respectively believed that the jurors in questions 12 and 14 followed the judge's instructions.

The source of this misunderstanding is conspicuous. It is ironic that to the extent that the sentencing scheme is designed to be a process of balancing aggravating and mitigating evidence, neither the IPI nor the *Free* instructions uses the term "balance" or "weigh." Rather, these instructions rely on the term "preclude," a world which is defined as "to prevent" or "rule out." *See* Webster's New International Dictionary of the English Language 1785 (3d ed. 1976). In addition to the likelihood that a juror would not know the definition of the word "preclude,"[16] the common usage of the term does not convey the notion that

---

**16.** According to *The Teacher's Word Book of 30,000 Words,* written by Thorndike and Lorge, the word "preclude" appears in common usage between two and three times per million words, while the close synonym "prevent" appears between fifty and one hundred times per million. To demonstrate the likelihood that the term "preclude" is commonly misunderstood, Professor Levi quizzed fifty-one of her students at Northwestern University. Of those students, which included a substantial number of seniors and juniors, only five could use the word correctly in a sentence, and only three could select its correct meaning from a field of six choices. Transcript at 527–29 (testimony of Prof. Levi).

the Illinois death penalty scheme requires a weighing process. As stated by Magistrate Judge Weisberg, the term contains two definite connotations undermining its effectiveness for the purpose it is being used:

> First, it has the sense of an absolute barrier to the death penalty, something comparable to a physical obstacle, in contrast to something arising out of a process of weighing in which a small difference on either side can change the outcome. Second, and relating to the foregoing, "preclude" suggests a *single* causative factor, that, as Professor Diamond put it, metaphorically "stops the bulldozer of aggravation in its tracks."

Report and Recommendation at 45. Moreover, to draw out the idea that the term requires weighing of aggravating and mitigating factors, the *Free* jurors would have successfully parsed through a double negative, an unlikely event: "On the other hand, if from your consideration of the evidence and after due deliberation you unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence then you *should return a verdict that the Defendant be sentenced to death*." Sentencing Transcript at C8444; *see* Transcript at 534–35 (testimony of Prof. Levi).[17]

Additionally, the phrase "sufficient to preclude" provides inadequate guidance in that the instructions are silent on what would be "sufficient." As explained by Professor Levi:

> If you use the word "sufficient," which is roughly equivalent to enough—and let's assume they know the word sufficient—although I wouldn't bet money on that either. But let's assume they know it means enough. The question is enough for what, enough for whom, enough according to what criteria? For example, if I ask you, do you have enough money with you, that's pretty vague. Now in a particular context, say,

we are going out for a cup of coffee, and in that context I say, do you have enough money with you, then you may infer that what I mean is enough money to buy your own cup of coffee, and maybe I'm inferring [sic, implying] to buy my cup of coffee also. It depends. But if we are going to, you know, purchase some large set of furniture, and I say do you have enough money with you, then I don't mean two dollars.... "Enough" is a word which is inherently very difficult to apply to a particular context without more information....

Secondly, they are not told that the task involves weighing anything. The verb "weigh" doesn't appear in either instructions, neither Zeisel nor the *Free* case.... So if I were a juror, and I was sitting there reading this sentence—let's take this clause: "If you unanimously find that there are no mitigating factors sufficient to preclude imposition of the death sentence," that word "sufficient" alone doesn't give me what I need. Because I need more information. How am I supposed to decide what is sufficient. Are there rules from the law? Am I just supposed to decide this off the top of my head? It needs to be grounded more, and there is not enough language in the instructions to ground it sufficiently.

Transcript at 521–23. In other words, the instructions do not provide guidance respecting whether the inquiry is a personal, subjective determination, as opposed to "a quasi-objective determination based on [a] perception of the standards of society, that the death penalty is unacceptable under [certain] circumstances." Report and Recommendation at 46. Moreover, the word "sufficient" when added to "preclude" does no more to illuminate the fact that the ultimate determination is to be made via a process of balancing evidence.

In sum, Free has demonstrated to a reasonable likelihood that his jury, like juries receiving the IPI instructions, was con-

---

17. We note that the comparable IPI instruction actually contains a quadruple negative: "If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death." *See* Transcript at 535 (testimony of Prof. Levi).

fused about which side, if any, had a burden of persuasion and the nature of that burden.

### IV. Conclusion

As noted at the outset, each of Free's remaining grounds (5, 10 & 14) has been rejected either by the Seventh Circuit or by this court. In *Silagy v. Peters*, 905 F.2d 986, 997–99 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), the Seventh Circuit rejected the argument that the Illinois death penalty statute and jury instructions unconstitutionally impose a presumption in favor of death (Ground 5). In so doing, the Seventh Circuit stated:

> By providing for a certain result *based on the balance struck by the jury between aggravating and mitigating circumstances,* [the Illinois death penalty scheme] does not impose a[n unconstitutional] burden of persuasion on the defendant. Rather, it serves to ensure that similar results will be achieved in similar circumstances while, at the same time, allowing the jury to consider the individual characteristics of the defendant and the particularized nature of the crime.

*Id.* at 999 (emphasis supplied). Drawing upon the holding in *Silagy*, this court rejected the related argument that the failure of the Illinois sentencing scheme to assign a specific standard of proof as to the ultimate issue renders the scheme unconstitutional (Ground 14). *Williams v. Chrans*, 742 F.Supp. 472, 499–500 (N.D.Ill.1990), *aff'd*, 945 F.2d 926 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). Finally, in *Williams*, this court dismissed the contention that the statute is unconstitutionally vague and fails to narrowly channel and guide the sentencing authority's discretion, thereby creating an impermissible risk that the death sentence will be imposed arbitrarily and capriciously, (Ground 10):

> We see no reason to doubt that sentencing juries properly interpret the statute as we have: the jurors are to weigh the aggravating and mitigating factors and may not sentence the defendant to death unless there is unanimous agreement that the mitigating factors are insufficient to justify sparing the defendant's life. The isolated phrase "sufficient to preclude the imposition of the death sentence" is not vague. It directs jurors to consider all of the factors presented and to give each factor whatever weight they deemed appropriate. The Eighth Amendment insists rather than frowns upon that kind of direction.

*Id.* at 500; *see also Williams*, 945 F.2d at 938 ("In our view, the instructions, when read as a whole, directed the jury to balance aggravating and mitigating factors and to impose the death sentence only if all members of the jury concluded that aggravating factors outweighed mitigating factors. Therefore, the Illinois statute is not unconstitutionally vague.").

Free, however, has presented empirical evidence refuting the underlying judicial assumptions driving the decisions in *Silagy* and *Williams*. After an exhaustive six-day hearing, post-trial briefing before Magistrate Judge Weisberg and the objection process before this court, we are convinced that the Zeisel surveys are in fact statistically reliable and valid, that is they fairly represent the levels of comprehension of the survey respondents regarding the capital sentencing instructions used in those surveys. Moreover, Free has demonstrated a reasonable likelihood that his jury (1) believed that only the statutory mitigating factors, or factors comparable to them, could preclude the imposition of the death penalty, and (2) was confused about (i) which side, if any, had a burden of persuasion, and (ii) the nature of that burden.

The conclusion to be drawn from the Zeisel survey data is apparent: The Illinois statute, as implemented through the IPI and *Free* jury instructions,[18] permits the

---

**18.** The importance of the jury instructions in capital sentencing hearings was set forth eloquently by Magistrate Judge Weisberg:

> Because the instructions, not the statute itself, immediately guide the decisionmaking process, it is essential that they be clear and intelligible. A questionable statute can be saved by a limiting instruction. Nevertheless, while decisions of the Illinois Supreme Court may have rendered the statute sufficiently

arbitrary and unguided imposition of the death sentence. As such, Free's sentence was imposed in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Consequently, we take the following actions: (1) we overrule both respondents' and petitioner's objections to the Magistrate Judge's Report and Recommendation; (2) we adopt Magistrate Judge Weisberg's Report and Recommen-dation; and (3) we grant Free's petition for habeas relief with respect to Grounds 5, 10 and 14. It is ordered that a writ of habeas corpus issue in this case vacating petitioner's sentence of death. The State shall have 120 days from the issuance of this order to resentence Free.[19]

On the court's own motion, the execution of this order is stayed pending appeal by the parties. It is so ordered.

## APPENDIX A

### April 1990 Jury Survey by Professor Hans Zeisel

#### TABLE OF CONTENTS

I. Introductory Question ............................................... 732
II. Introduction....................................................... 733
III. Summary of the Trial .............................................. 733
IV. Sentencing Hearing................................................ 734
 A. Stage One ...................................................... 734
 B. Final Stage .................................................... 734
V. Jury Instructions ................................................. 734
VI. The Questions..................................................... 735

---

### JURY SURVEY

#### I. *Introductory Question*

This questionnaire is designed to learn about how you think a juror should inter-. pret the legal rules or instructions that a judge gives the jury in a death penalty case. The questions are about a hypothetical case.

Before proceeding further, however, we need to ask you a question about your attitude if you were a juror in a death penalty case.

Please read the following statements completely and then check the statement that would come closest to your attitude if you were a juror in a death penalty case:

(___) If the defendant was found guilty of a murder for which the law allowed the jury to impose a death sentence, I would *always* vote to sentence the defendant to death.

(___) I am in favor of the death penalty, but I would not necessarily vote for it in every case where the law allowed the jury to choose it. I would consider the facts of the particular case and then decide whether the defendant deserved the death sentence.

(___) I have certain reservations about the death penalty but they would not substantially impair my ability to find the defendant guilty if the facts of the case showed that the *defendant was*

specific as a matter of law—a question not that is not before us—neither the jury in Free's case nor juries hearing the IPI instructions received those interpretations. In determining whether capital sentencing under the Illinois statute is likely to be arbitrary or capricious, we cannot view the statute apart from the instructions through which jurors encounter it.

Report and Recommendation at 51.

**19.** In his objection's to the Report and Recommendation, Free argues that the State may not resentence him to death. *See* Ill.Rev.Stat. ch. 38, ¶ 9–1(j) (Supp.1992). However, as resolution of this particular issue hinges on an application of state law, we must defer this matter to the Illinois courts.

guilty, and to vote for a death sentence if the facts of the case showed that the defendant should be given a death sentence.

(____) I have such strong reservations about the death penalty that they would substantially impair my ability to find the defendant guilty of a crime for which the death sentence might be imposed (even if the facts of the case showed that the defendant was guilty), or which would substantially impair my ability to consider voting for a death sentence (no matter what the facts of the case were).

## II. Introduction

We ask you to assume that a jury voted to convict John Woods for the murder and attempted rape of Anne Miller and for the attempted murder and attempted rape of Susan Harris. The jury also found Mr. Woods eligible for the death penalty: some murders are *not* eligible. The jury was then asked to decide whether or not to impose the death penalty on Mr. Woods.

We will ask you about different decisions that different jurors might have reached. We are only interested in whether you believe the juror used the right legal standard in making the decision. You should tell us whether the juror followed or violated the judge's instructions—not whether they reached the right result. It is possible that a juror may violate the instructions even though she reached the verdict that you believe is right. In that case, you should tell us that the juror violated the instructions. Similarly, a juror may follow the instructions, but reach a verdict that you think is wrong. In that case, you should tell us that the juror followed the instructions.

## III. *Summary of the Trial*

These are the facts that the jury accepted as true. You should accept them too.

The defendant, John Woods, broke into an office building late one night where he found Ms. Harris and Ms. Miller, two all-night key punch operators who were at work. He had never met them before. Mr. Woods pulled out a gun and told the women to disrobe because he wanted to rape them. Both women disrobed.

Mr. Woods took some rope out of a bag he had brought with him and tied up Ms. Harris. Then, Mr. Woods took Ms. Miller into another room.

Mr. Woods then went back to the first room to check on Ms. Harris. He discovered she had loosened the rope around her feet. As he was tightening the ropes, he heard Ms. Miller run from the second room. Mr. Woods ran after her and shot her dead.

Mr. Woods then returned to the room where Ms. Harris was lying. As she tried to turn away from him, Mr. Woods shot Ms. Harris.

Ms. Harris survived and called the police.

Forensic evidence established that Mr. Woods did not rape either women, but he did cause Ms. Miller's death and serious injuries to Ms. Harris.

In addition, the jury heard the following testimony.

Mr. Woods testified that on the night and into the morning of the murder, he drank numerous beers and smoked marijuana laced with a hallucinogenic drug, PCP. Mr. Woods testified that he had a history of alcohol abuse. Mr. Woods testified that he had no actual recollection of what he had done that night.

Mr. Woods presented an insanity defense. A psychiatrist who examined Mr. Woods, testified that Mr. Woods was suffering from a mental disease; "a toxic psychosis secondary to some sort of chemical or drug intoxication."

A state psychiatrist testified that in his opinion Mr. Woods was sane and, "was not rendered incapable of acting intentionally." His opinion was based on the observations and examinations he conducted on Mr. Woods.

The jury rejected the insanity defense. It unanimously found the defendant guilty of the murder and attempted rape of Ms.

Miller, and attempted murder and attempted rape of Ms. Harris.

## IV. *Sentencing Hearing*

### A. *Stage One*

Following that verdict, the court held a sentencing hearing in two parts. The judge instructed the jury that at the first part of the hearing, the jury's only question was whether Mr. Woods was eligible for the death penalty. At this first part, the State had the burden of proof beyond a reasonable doubt.

At this first part of the hearing, the State presented evidence that Mr. Woods was 25 years old at the time of the crime.

The defense presented no evidence.

At this part, the judge instructed the jury:

Mr. Woods is eligible for a death sentence under the law only if the State proves to you beyond a reasonable doubt: first, that Mr. Woods was at least 18 years old at the time of the murder, and, second, that the murdered person was killed intentionally in the course of another felony, in this case an attempted rape ...

The jury then deliberated and reached an unanimous verdict that Mr. Woods *was* eligible for the death penalty, because the state proved beyond a reasonable doubt that he was 25 years old and that he intentionally killed Ms. Miller in the course of an attempted rape. This verdict was correct and you should accept it.

After the jury found Mr. Woods eligible for the death penalty, the judge then started the second part of the sentencing hearing. At this second part of the sentencing hearing, the jury was asked to decide whether or not to impose the death penalty on Mr. Woods.

### B. *Final Stage*

At the final stage, the state presented the defendant's criminal record: he had been convicted of theft on three prior occasions, each within the last five years.

The defense presented evidence that as a child Mr. Woods was an altar boy. His family testified that he had always been friendly, helpful and never rowdy or violent.

Then, Mr. Woods addressed the jury and said he made a very grave and serious mistake that he would regret the rest of his life, but that he was not the terrible person the State's Attorney made him out to be. "I'm pleading for my life."

The defense attorney in his closing argument asked the jury to go back and search their minds and hearts, and submitted that when they considered it in all of its proportions that they would say, "There are mitigating factors...."

In closing argument, the prosecutor argued that John Woods had the justice he deserves. The only mercy he deserved is the type of mercy he showed to Anne Miller.

To guide the jury on how to go about its decision, the judge instructed them on the law that governed their life and death decision. Since it is your understanding of these instructions that are important, I will read them to you. You will have the instructions with you when you answer the questions.

## V. *Jury Instructions*

The judge instructed the jury as follows: Aggravating factors may be found in any evidence presented during the trial, the first part of the death penalty hearing or the second part of the death penalty hearing. During the first part of the death penalty hearing you found that the State had proved that a statutory aggravating factor exists. During the second part of the death penalty hearing the State may prove that other aggravating factors exist, but the State is not required to do so.

Mitigating factors may be found in any evidence presented during the trial, during the first part of the death penalty hearing or during the second part of the death penalty hearing. During the second part of the death penalty hearing the defendant may prove that mitigating fac-

tors exist, but the defendant is not required to do so.

Under the law the defendant shall be sentenced to death if you unanimously find that there are no mitigating factors sufficient to preclude imposition of a death sentence. If you are unable to unanimously find that there are no mitigating factors sufficient to preclude imposition of a death sentence, the court will impose a sentence other than death.

In deciding whether the defendant should be sentenced to death, you should consider all the aggravating factors supported by the evidence and all the mitigating factors supported by the evidence.

Aggravating factors are reasons why the defendant should be sentenced to death. Mitigating factors are reasons why the defendant should not be sentenced to death.

Aggravating factors include:

First: The murdered person was intentionally killed in the course of another felony;

Any other reason supported by the evidence why the defendant should be sentenced to death.

Mitigating factors include:

That the murder was committed while the defendant was under the influence of an extreme mental or emotional disturbance, although not such as to constitute a defense to the prosecution.

The defendant has no significant history of prior criminal activity.

The murdered person was a participant in the defendant's homicidal conduct or consented to the homicidal act.

The defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm.

The defendant was not personally present during the commission of the act or acts causing death.

The defendant may be rehabilitated or restored to useful citizenship.

Any other reason supported by the evidence why the defendant should not be sentenced to death.

If you unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict form requiring the court to sentence the defendant to death.

If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death.

You will receive two verdict forms, A and B. These verdict forms read as follows:

A. Verdict Form Approving the Death Sentence:

We, the jury, unanimously find that there are no mitigating factors sufficient to preclude imposition of a death sentence.

The court shall sentence the defendant John Woods to death.

B. Verdict Form Rejecting the Death Sentence:

We, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence.

The court shall not sentence the defendant John Woods to death.

## VI. The Questions

We will now tell you about some judgments that one or another juror made in this case. And after each example, we will ask you whether, under the judge's instructions as you understand them, the juror followed or violated the judge's instructions in making that particular decision. Please remember the question is *not* what you as a juror would do. The question is *not* whether the juror reached the right or wrong result. The only question is whether the juror followed or violated the judge's instructions.

*Now, please turn the page and answer the following questions about this case.*

*Question 1.*

The juror, going over all the mitigating circumstances finds that all of them were minor and that none of them are a major mitigating circumstance. However, the juror votes against the death penalty. Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 2.*

A juror is persuaded that the fact that Mr. Woods was good as a boy is a mitigating factor sufficient to preclude the death penalty. However, she notes that being a good child is not one of the mitigating factors which the judge specifically mentioned. She also believes that being a good child is not an excuse for the murder which is comparable to the other mitigating factors which the judge specifically mentioned. For this reason, she concludes that she has no choice and must vote for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 3.*

A juror decides that Mr. Woods was under the influence of an extreme emotional disturbance at the time he committed the murder. She decides that this fact is not a sufficient mitigating factor to preclude the death penalty and votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 4.*

A juror decides that the fact that Mr. Woods was only 25 years of age when he committed the murder is a mitigating factor sufficient to preclude the death penalty. However the other eleven jurors disagree and insist that his age is not a mitigating factor. The one juror believes that she cannot consider a mitigating factor unless the entire jury agrees upon it and votes for the death

penalty. She votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 5.*

A juror decides that the fact that Mr. Woods was good to his family is a mitigating factor sufficient to preclude the death penalty. However, the other eleven jurors disagree. The other jurors insist that no juror should consider the defendant's good relations with his family as a mitigating factor unless they all agree it is a mitigating factor. The one juror accepts this approach and votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 6.*

A juror decides that Mr. Woods was not under the influence of an extreme emotional disturbance when he committed the murder, but that he did suffer from a mild emotional disturbance at the time of the murder. She concludes that the judge's instructions required that an emotional disturbance be an "extreme" disturbance in order to be a sufficient mitigating factor, and thus a mild emotional disturbance cannot be a mitigating factor sufficient to impose death. She votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 7.*

A juror decides that the fact that Mr. Woods did not kill more than one person is a reason sufficient not to sentence him to death. However, she also concludes that this fact is not one of the mitigating factors which the judge specifically mentioned. She also does not believe this fact provides a reason to spare the defendant's life that is comparable to any with the mitigating factors which the judge specifically mentioned. She concludes that as a result she must vote for the death penalty and does so.

Has that juror followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 8.*

A juror decides that the fact that Mr. Woods did not actually rape either of the women is a mitigating factor sufficient to preclude the death penalty. She votes against the death penalty.

Has that juror followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 9.*

A juror decides that Mr. Woods had a significant criminal record. However, the juror also concludes that the fact that none of Mr. Woods prior crimes was violent is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 10.*

A juror decides that Mr. Woods will never be rehabilitated to useful citizenship. But she also decides that Mr. Woods may be rehabilitated enough to be a safe and obedient prisoner. She concludes that this is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 11.*

A juror decides that the fact that Mr. Woods very much regretted what he did is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 12.*

A juror considers all the evidence and comes to the conclusion that the mitigating evidence outweighs the aggravating evidence and that death is not appropriate. However, she cannot find a mitigating factor that is sufficient to *preclude* the death penalty. The juror votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 13.*

After hearing all the evidence in this case, a juror is not persuaded one way or another as to whether there are or are not mitigating factors sufficient to preclude the death penalty. Because the juror has not found that there is a mitigating factor sufficient to preclude death, the juror votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 14.*

A juror believes that what Mr. Woods did is terrible, but in her personal judgment it is not so terrible that he should be given the death penalty. However, on the other hand, she believes the mitigating evidence is no excuse whatsoever for what Mr. Woods did and that there are no mitigating factors sufficient to preclude the death penalty in this case. She votes for the death penalty.

Has she followed the judge's instructions?

Yes (__) No (__) Do Not Know (__)

*Question 15.*

The jury in stage one found the defendant eligible for death. Which, if any, of the following four statements are correct and which if any are incorrect under the instructions given by the judge in this case:

A. Once the jury finds the defendant is eligible for death, the prosecution must prove that mitigating factors do not exist; unless it does, the jury must vote against the death penalty.

Correct (__) Incorrect (__) Do Not Know (__)

B. Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that mitigating factors exist; unless he does, the jury must vote for the death penalty.

Correct (__) Incorrect (__) Do Not Know (__)

C. Once the jury finds the defendant is eligible for death, the prosecution must prove that the death penalty should be imposed; unless it does, the jury must vote against the death penalty.

Correct (＿) Incorrect (＿) Do Not Know (＿)

D. Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that the death penalty should not be imposed; unless he does, the jury must vote for the death penalty.

Correct (＿) Incorrect (＿) Do Not Know (＿)

*Question 16.*

After deliberating for two days, nine jurors are convinced that death should be imposed. Three jurors believe death should not be imposed. The jurors are all convinced that they will not change their mind. Read the following three statements and check the one which best describes, under the judge's instruction, what the jury should do:

(＿) (a) All sign the verdict form "we, the jury, unanimously find that there are no mitigating factors sufficient to preclude the imposition of a death sentence."

(＿) (b) All sign the verdict form, "we, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence."

(＿) (c) Tell the judge they cannot reach an unanimous verdict.

*Question 17.*

Finally, based on the little you know about this case, how do you feel about it? Would you lean toward the death penalty or would you lean toward voting against it?

(＿) Lean Toward (＿) Lean Against

*Question 18.*

Have you served as a juror in a death penalty case in Illinois in the last ten years?

Yes (＿) No (＿) Do Not Know (＿)

## APPENDIX B
### January 1992 Jury Survey by Professor Hans Zeisel
#### TABLE OF CONTENTS

I. Introductory Question ............................................. 738
II. Introduction ..................................................... 739
III. Summary of the Trial ............................................ 739
IV. Sentencing Hearing............................................... 740
 A. Stage One .................................................... 740
 B. Final Stage .................................................. 740
V. Jury Instructions ............................................... 740
VI. The Questions.................................................... 742

## JURY SURVEY

### I. *Introductory Question*

This questionnaire is designed to learn about how you think a juror should interpret the legal rules or instructions that a judge gives the jury in a death penalty case. The questions are about a hypothetical case.

Before proceeding further, however, we need to ask you a question about your attitude if you were a juror in a death penalty case.

Please read the following statements completely and then check the statement that would come closest to your attitude if you were a juror in a death penalty case:

(＿) If the defendant was found guilty of a murder for which the law allowed the jury to impose a death sentence, I

would *always* vote to sentence the defendant to death.

(___) I am in favor of the death penalty, but I would not necessarily vote for it in every case where the law allowed the jury to choose it. I would consider the facts of the particular case and then decide whether the defendant deserved the death sentence.

(___) I have certain reservations about the death penalty but they would not substantially impair my ability to find the defendant guilty if the facts of the case showed that the defendant was guilty, and to vote for a death sentence if the facts of the case showed that the defendant should be given a death sentence.

(___) I have such strong reservations about the death penalty that they would substantially impair my ability to find the defendant guilty of a crime for which the death sentence might be imposed (even if the facts of the case showed that the defendant was guilty), or which would substantially impair my ability to consider voting for a death sentence (no matter what the facts of the case were).

## II. Introduction

We ask you to assume that a jury voted to convict John Woods for the murder and attempted rape of Anne Miller and for the attempted murder and attempted rape of Susan Harris. The jury also found Mr. Woods eligible for the death penalty: some murders are *not* eligible. The jury was then asked to decide whether or not to impose the death penalty on Mr. Woods.

We will ask you about different decisions that different jurors might have reached. We are only interested in whether you believe the juror used the right legal standard in making the decision. You should tell us whether the juror followed or violated the judge's instructions—not whether they reached the right result. It is possible that a juror may violate the instructions even though she reached the verdict that you believe is right. In that case, you should tell us that the juror violated the instructions. Similarly, a juror may follow the instructions, but reach a verdict that you think is wrong. In that case, you should tell us that the juror followed the instructions.

## III. *Summary of the Trial*

These are the facts that the jury accepted as true. You should accept them too.

The defendant, John Woods, broke into an office building late one night where he found Ms. Harris and Ms. Miller, two all-night key punch operators who were at work. He had never met them before. Mr. Woods pulled out a gun and told the women to disrobe because he wanted to rape them. Both women disrobed.

Mr. Woods took some rope out of a bag he had brought with him and tied up Ms. Harris. Then, Mr. Woods took Ms. Miller into another room.

Mr. Woods then went back to the first room to check on Ms. Harris. He discovered she had loosened the rope around her feet. As he was tightening the ropes, he heard Ms. Miller run from the second room. Mr. Woods ran after her and shot her dead.

Mr. Woods then returned to the room where Ms. Harris was lying. As she tried to turn away from him, Mr. Woods shot Ms. Harris.

Ms. Harris survived and called the police.

Forensic evidence established that Mr. Woods did not rape either women, but he did cause Ms. Miller's death and serious injuries to Ms. Harris.

In addition, the jury heard the following testimony.

Mr. Woods testified that on the night and into the morning of the murder, he drank numerous beers and smoked marijuana laced with a hallucinogenic drug, PCP. Mr. Woods testified that he had a history of alcohol abuse. Mr. Woods testified that he had no actual recollection of what he had done that night.

Mr. Woods presented an insanity defense. A psychiatrist who examined Mr. Woods, testified that Mr. Woods was suffering from a mental disease; "a toxic psy-

chosis secondary to some sort of chemical or drug intoxication."

A state psychiatrist testified that in his opinion Mr. Woods was sane and, "was not rendered incapable of acting intentionally." His opinion was based on the observations and examinations he conducted on Mr. Woods.

The jury rejected the insanity defense. It unanimously found the defendant guilty of the murder and attempted rape of Ms. Miller, and attempted murder and attempted rape of Ms. Harris.

### IV. *Sentencing Hearing*

#### A. *Stage One*

Following that verdict, the court held a sentencing hearing in two parts. The judge instructed the jury that at the first part of the hearing, the jury's only question was whether Mr. Woods was eligible for the death penalty. At this first part, the State had the burden of proof beyond a reasonable doubt.

At this first part of the hearing, the State presented evidence that Mr. Woods was 25 years old at the time of the crime.

The defense presented no evidence.

At this part, the judge instructed the jury:

> Mr. Woods is eligible for a death sentence under the law only if the State proves to you beyond a reasonable doubt: first, that Mr. Woods was at least 18 years old at the time of the murder, and, second, that the murdered person was killed intentionally in the course of another felony, in this case an attempted rape ...

The jury then deliberated and reached an unanimous verdict that Mr. Woods *was* eligible for the death penalty, because the state proved beyond a reasonable doubt that he was 25 years old and that he intentionally killed Ms. Miller in the course of an attempted rape. This verdict was correct and you should accept it.

After the jury found Mr. Woods eligible for the death penalty, the judge then started the second part of the sentencing hear-ing. At this second part of the sentencing hearing, the jury was asked to decide whether or not to impose the death penalty on Mr. Woods.

#### B. *Final Stage*

At the final stage, the state presented the defendant's criminal record: he had been convicted of theft on three prior occasions, each within the last five years.

The defense presented evidence that as a child Mr. Woods was an altar boy. His family testified that he had always been friendly, helpful and never rowdy or violent.

Then, Mr. Woods addressed the jury and said he made a very grave and serious mistake that he would regret the rest of his life, but that he was not the terrible person the State's Attorney made him out to be. "I'm pleading for my life."

The defense attorney in his closing argument asked the jury to go back and search their minds and hearts, and submitted that when they considered it in all of its proportions that they would say, "There are mitigating factors...."

In closing argument, the prosecutor argued that John Woods had the justice he deserves. The only mercy he deserved is the type of mercy he showed to Anne Miller.

To guide the jury on how to go about its decision, the judge instructed them on the law that governed their life and death decision. Since it is your understanding of these instructions that are important, I will read them to you. You will have the instructions with you when you answer the questions.

### V. *Jury Instructions*

The judge instructed the jury as follows:

Members of the jury, the evidence, information and arguments as to this phase of the sentencing hearing have been completed and I will now instruct you as to the law.

The law applicable to this phase of the case is stated in these instructions and it is your duty to follow all of them.

You must not single out certain instructions and disregard others.

The evidence and information which you should consider consists of the testimony of the witnesses and the exhibits which the Court has received at all three phases of the trial.

You are to apply the law to this evidence and in this way decide the case.

From time to time it has been the duty of the Court to rule on the admissibility of evidence. You must not concern yourselves with the reasons for these rulings.

You should disregard questions and exhibits which were withdrawn or to which objections were sustained.

You should also disregard testimony and exhibits which the Court has refused or stricken.

You should consider all of the evidence and information in the light of your own observation and experience in life.

Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be.

It is now your duty to determine whether the sentence of death should be imposed upon this Defendant or whether the issue of sentencing the Defendant to a specific number of years, ranging from 20 years to the natural life of the Defendant, will be left to the Court.

In making that determination you shall consider any aggravating factors and any mitigating factors which are relevant to the imposition of the death penalty.

You are not to concern yourself with the sentences upon the other offenses. The imposition of the sentences thereon is for determination by the Court.

If you unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude the imposition of a sentence of death then you should return a verdict imposing a sentence of death.

If, on the other hand, you do not unanimously find that there are no mitigating factors sufficient to preclude the imposition of a sentence of death then you should return a verdict that the sentence of death should not be imposed.

Aggravating factors are those facts and circumstances which provide reasons for imposing a more severe sentence.

Mitigating factors are those facts and circumstances which provide reasons for imposing a less severe sentence.

You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them.

In considering the testimony of any witness you make take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the sentencing hearing.

You should judge the testimony of the Defendant in the same manner as you judge the testimony of any other witness.

Arguments are made by the attorneys to discuss the facts and circumstances in this case which bear upon the question of whether the death sentence should be imposed and should be confined to the evidence and reasonable inferences to be drawn therefrom.

The attorneys' arguments are not evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

Mitigating factors include but are not limited to the following circumstances.

One, the Defendant has no significant history of prior criminal activity.

Two, the murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution.

If, from your consideration of the evidence, you find that any of the above mitigating factors are present in this case, or that any other mitigating factors are present in this case then you should consider such factors in light of any existing aggra-

vating factors in determining whether the death sentence shall be imposed.

In order to determine that the Defendant be sentenced to death you must unanimously find:

One, that there are no mitigating factors sufficient to preclude the imposition of the death sentence.

If, from your consideration of the evidence and after your due deliberation, there is at least one of you who finds that there is at least one mitigating factor sufficient to preclude the imposition of the death sentence then you should return a verdict that the Defendant be sentenced to imprisonment.

On the other hand, if from your consideration of the evidence and after your due deliberation you unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence then you should return a verdict that the Defendant be sentenced to death.

When you retire to the jury room the foreman or forelady previously elected by you, or a new foreman or forelady elected by you, will preside during your deliberations upon your verdict.

Your verdict must be in writing and signed by all of you, including your foreman.

Faithful performance by you of your duties as jurors is vital to the administration of justice.

You will be provided with two forms of verdict.

When you have agreed upon your verdict you will select the form which reflects your verdict and sign it as I have stated.

The forms of verdict which you will receive read as follows:

We, the jury, cannot unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence. Therefore, the Defendant should be sentenced to imprisonment as determined by the Court.

We, the jury, unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence. Therefore, the Defendant should be sentenced to death.

## VI. *The Questions*

We will now tell you about some judgments that one or another juror made in this case. And after each example, we will ask you whether, under the judge's instructions as you understand them, the juror followed or violated the judge's instructions in making that particular decision. Please remember the question is *not* what you as a juror would do. The question is *not* whether the juror reached the right or wrong result. The only question is whether the juror followed or violated the judge's instructions.

*Now, please turn the page and answer the following questions about this case.*
*Question 1.*

The juror, going over all the mitigating circumstances finds that all of them were minor and that none of them are a major mitigating circumstance. However, the juror votes against the death penalty. Has that juror followed the judge's instructions?

Yes (＿＿) No (＿＿) Do Not Know (＿＿)
*Question 2.*

A juror is persuaded that the fact that Mr. Woods was good as a boy is a mitigating factor sufficient to preclude the death penalty. However, she notes that being a good child is not one of the mitigating factors which the judge specifically mentioned. She also believes that being a good child is not an excuse for the murder which is comparable to the other mitigating factors which the judge specifically mentioned. For this reason, she concludes that she has no choice and must vote for the death penalty.

Has that juror followed the judge's instructions?

Yes (＿＿) No (＿＿) Do Not Know (＿＿)
*Question 3.*

A juror decides that Mr. Woods was under the influence of an extreme emotional disturbance at the time he committed

the murder. She decides that this fact is not a sufficient mitigating factor to preclude the death penalty and votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

Question 4.

A juror decides that the fact that Mr. Woods was only 25 years of age when he committed the murder is a mitigating factor sufficient to preclude the death penalty. However the other eleven jurors disagree and insist that his age is not a mitigating factor. The one juror believes that she cannot consider a mitigating factor unless the entire jury agrees upon it and votes for the death penalty. She votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

Question 5.

A juror decides that the fact that Mr. Woods was good to his family is a mitigating factor sufficient to preclude the death penalty. However, the other eleven jurors disagree. The other jurors insist that no juror should consider the defendant's good relations with his family as a mitigating factor unless they all agree it is a mitigating factor. The one juror accepts this approach and votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

Question 6.

A juror decides that Mr. Woods was not under the influence of an extreme emotional disturbance when he committed the murder, but that he did suffer from a mild emotional disturbance at the time of the murder. She concludes that the judge's instructions required that an emotional disturbance be an "extreme" disturbance in order to be a sufficient mitigating factor, and thus a mild emotional disturbance cannot be a mitigating factor sufficient to preclude death. She votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

Question 7.

A juror decides that the fact that Mr. Woods did not kill more than one person is a reason sufficient not to sentence him to death. However, she also concludes that this fact is not one of the mitigating factors which the judge specifically mentioned. She also does not believe this fact provides a reason to spare the defendant's life that is comparable to any with the mitigating factors which the judge specifically mentioned. She concludes that as a result she must vote for the death penalty and does so.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

Question 9.

A juror decides that Mr. Woods had a significant criminal record. However, the juror also concludes that the fact that none of Mr. Woods prior crimes was violent is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

Question 10.

A juror decides that Mr. Woods will never be rehabilitated to useful citizenship. But she also decides that Mr. Woods may be rehabilitated enough to be a safe and obedient prisoner. She concludes that this is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

Question 11.

A juror decides that the fact that Mr. Woods very much regretted what he did is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 12.*

A juror considers all the evidence and comes to the conclusion that the mitigating evidence outweighs the aggravating evidence and that death is not appropriate. However, she cannot find a mitigating factor that is sufficient to *preclude* the death penalty. The juror votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 13.*

After hearing all the evidence in this case, a juror is not persuaded one way or another as to whether there are or are not mitigating factors sufficient to preclude the death penalty. Because the juror has not found that there is a mitigating factor sufficient to preclude death, the juror votes for the death penalty.

Has that juror followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 14.*

A juror believes that what Mr. Woods did is terrible, but in her personal judgment it is not so terrible that he should be given the death penalty. However, on the other hand, she believes the mitigating evidence is no excuse whatsoever for what Mr. Woods did and that there are no mitigating factors sufficient to preclude the death penalty in this case. She votes for the death penalty.

Has she followed the judge's instructions?

Yes (___) No (___) Do Not Know (___)

*Question 15.*

The jury in stage one found the defendant eligible for death. Which, if any, of the following four statements are correct and which if any are incorrect under the instructions given by the judge in this case:

A. Once the jury finds the defendant is eligible for death, the prosecution must prove that mitigating factors do not exist; unless it does, the jury must vote against the death penalty.

Correct (___) Incorrect (___) Do Not Know (___)

B. Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that mitigating factors exist; unless he does, the jury must vote for the death penalty.

Correct (___) Incorrect (___) Do Not Know (___)

C. Once the jury finds the defendant is eligible for death, the prosecution must prove that the death penalty should be imposed; unless it does, the jury must vote against the death penalty.

Correct (___) Incorrect (___) Do Not Know (___)

D. Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that the death penalty should not be imposed; unless he does, the jury must vote for the death penalty.

Correct (___) Incorrect (___) Do Not Know (___)

*Question 16.*

After deliberating for two days, nine jurors are convinced that death should be imposed. Three jurors believe death should not be imposed. The jurors are all convinced that they will not change their mind. Read the following three statements and check the one which best describes, under the judge's instruction, what the jury should do:

(___) (a) All sign the verdict form "we, the jury, unanimously find that there are no mitigating factors sufficient to preclude the imposition of a death sentence."

(___) (b) All sign the verdict form, "we, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence."

(___) (c) Tell the judge they cannot reach an unanimous verdict.

*Question 17.*

Finally, based on the little you know about this case, how do you feel about it?

| Would you lean toward the death penalty or would you lean toward voting against it? | Have you served as a juror in a death penalty case in Illinois in the last ten years? |
|---|---|
| (___) Lean Toward (___) Lean Against | Yes (___) No (___) Do Not Know (___) |

## APPENDIX C

Comparison of *Free* and IPI Jury Instructions by Professor Judith N. Levi

**COMPARISON OF F.J.I. AND Z.I. POINT BY POINT**

[Second version: 1/14/92 11 a.m.]

Prof. Judith N. Levi

Northwestern University

FJI = Instructions given in the Free trial, based on transcript
ZI = Instructions given in the Zeisel Capital Jury Survey
Agr = Aggravating factor(s) Mit = Mitigating factor(s)
DP = death penalty, death sentence

Key: ✓ = comprehension likely for most jurors
 ✓ – (–) = comprehension likely to be impeded for many jurors; more minus signs = greater problems
 —— = information not provided/not comprehensible at all

| | ZI | FJI |
|---|---|---|
| **FIRST SET: POINTS WHICH ARE REASONABLY WELL EXPRESSED IN BOTH VERSIONS** | | |
| 1. Choice is between a sentence of death and a sentence of "other than death." | ✓ | ✓ |
| 2. Jury must consider Agr and Mit factors in reaching their verdict. | ✓ | ✓ |
| 3. Mit factors include (a) no significant prior criminal history and (b) extreme mental or emotional distress at time of murder. | ✓ | ✓ |
| **SECOND SET: POINTS FOR WHICH COMPREHENSION IS (NEEDLESSLY) DIFFICULT IN BOTH VERSIONS** | | |
| 1. The fundamental task of the jury is to WEIGH the Agr and the Mit in order to decide which set outweighs the other, because that judgment is what should determine which penalty is the appropriate one to impose in this particular case. | ✓ – – | ✓ – – |
| 2. Each juror is entitled to arrive at his or her own decision as to what constitutes an Agr or a Mit factor (regardless of what judge does or does not list as an example). | ✓ – – | ✓ – – |
| 3. Each juror is entitled to arrive at his or her own decision as to what constitutes a Mit factor "sufficient to preclude the DP." | ✓ – – | ✓ – – |
| 4. It is not necessary to identify one single Mit factor that *by itself* would be sufficient to preclude the death penalty, in order to vote for imprisonment. | ✓ – – | ✓ – – |
| 5. Each juror is entitled to arrive at his or her own decision as to whether the total of Agr factors outweighs the total of Mit factors, or vice versa. | ✓ – – | ✓ – – |
| 6. All it takes to REQUIRE a verdict of imprisonment is one juror who believes that there is one mitigating factor sufficient to preclude the DP. | ✓ – – | ✓ – |
| 7. Of all possible outcomes in terms of juror opinion (such as splits of 1–11, 2–10, 6–6), 12 require a verdict of | | |

imprisonment and only 1 (unanimous in favor of DP) requires a verdict of death. ✓ — — ✓ —

Nonunanimous positions on the verdict therefore require a verdict of imprisonment, not a verdict of "We
8. can't reach a decision, Your Honor." ✓ — — ✓ —

If a juror cannot decide on whether the Agr outweighs the Mit or vice versa, the juror should vote for
9. imprisonment. ✓ — — ✓ — —

Being "under the influence of extreme mental or emotional disturbance" at the time of the murder may count as a mitigating factor even if it didn't count as
10. a defense within the trial itself. ✓ — ✓ —

What comes under the heading of the "evidence" that jurors may consider in deciding on what constitutes Agr and Mit factors? Do points raised in attorneys'
11. arguments count? ✓ — ✓ —

## THIRD SET: POINTS WHICH ARE EXPRESSED MORE CLEARLY OR FULLY OR ADEQUATELY IN Z.I.

1. Agr factors may be found in any evidence presented in any of the three phases of the trial. ✓ ✓ — —
2. The State may prove that other Agr factors exist (beyond statutory ones from phase 2) but need not do so. ✓ · — —
3. One example of an aggravating factor is "the murdered person is intentionally killed in the course of another felony." ✓ ——
4. Other reasons supported by evidence may be considered aggravating factors. ✓ ✓ — —
5. Mitigating factors may be found in any evidence presented in any of the three phrases of the trial. ✓ ✓ — —
6. The defendant may prove that Mit factors exist but need not do so. ✓ ——
7. Examples of Mit are: [ZI gives 6, FJI gives 2] ✓ ✓ —
8. Examples of Mit may include not only factors that look back to the past (the defendant's life and the details of the crime) but also those which consider the future, such as possibility of rehabilitation for the defendant. ✓ ✓ — —
9. Examples of Mit can include "any other reason supported by the evidence why the defendant should not be sentenced to death." ✓ ✓ —

## FOURTH SET: POINTS WHICH ARE EXPRESSED MORE CLEARLY OR FULLY OR ADEQUATELY IN F.J.I.

1. The alternative to the DP is imprisonment for 20 years to life. —— ✓
2. If jury chooses imprisonment, the Court decides length of prison term. —— ✓
3. The jury must return a verdict for imprisonment if "at least one of you ... finds that there is at least one Mit sufficient to preclude [DP]." ✓ — — ✓ (—)

APPENDIX D ·

April 1990 Jury Survey Split–Half Reliability Analysis by Professor Hans Zeisel

QUESTION NO. 1

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 28 | 13 | 15 |
| | 29.2 | 27.1 | 31.3 |
| NO | 63 | 34 | 29 |
| | 65.6 | 70.8 | 60.4 |
| DON'T KNOW | 5 | 1 | 4 |
| | 5.2 | 2.1 | 8.3 |
| NOT ANSWERING | | | |

QUESTION NO. 2

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1–63 | 64–118 |
| ALL·RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 54 | 27 | 27 |
| | 56.3 | 56.3 | 56.3 |
| NO | 37 | 18 | 19 |
| | 38.5 | 37.5 | 39.6 |
| DON'T KNOW | 5 | 3 | 19 |
| | 5.2 | 6.3 | 4.2 |
| NOT ANSWERING | | | |

QUESTION NO. 3

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 49 | 24 | 25 |
| | 51.0 | 50.0 | 52.1 |
| NO | 42 | 23 | 19 |
| | 43.8 | 47.9 | 39.6 |
| DON'T KNOW | 5 | 1 | 4 |
| | 5.2 | 2.1 | 8.3 |
| NOT ANSWERING | | | |

QUESTION NO. 4

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 24 | 14 | 10 |
| | 25.0 | 29.2 | 20.8 |
| NO | 64 | 31 | 33 |
| | 66.7 | 64.6 | 68.8 |
| DON'T KNOW | 8 | 3 | 5 |
| | 8.3 | 6.3 | 10.4 |
| NOT ANSWERING | | | |

QUESTION NO. 5

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 35 | 22 | 13 |
| | 36.5 | 45.8 | 27.1 |
| NO | 54 | 21 | 33 |
| | 56.3 | 43.8 | 68.8 |
| DON'T KNOW | 7 | 5 | 2 |
| | 7.3 | 10.4 | 4.2 |
| NOT ANSWERING | | | |

---

QUESTION NO. 7

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 62 | 33 | 29 |
| | 64.6 | 68.8 | 60.4 |
| NO | 28 | 12 | 16 |
| | 29.2 | 25.0 | 33.3 |
| DON'T KNOW | 6 | 3 | 3 |
| | 6.3 | 6.3 | 6.3 |
| NOT ANSWERING | | | |

---

QUESTION NO. 8

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
|---|---|---|---|
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 27 | 11 | 16 |
| | 28.1 | 22.9 | 33.3 |
| NO | 63 | 34 | 29 |
| | 65.6 | 70.8 | 60.4 |
| DON'T KNOW | 5 | 3 | 2 |
| | 5.2 | 6.3 | 4.2 |
| NOT ANSWERING | 1 | | 1 |
| | 1.0 | | 2.1 |

---

QUESTION NO. 9

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
|---|---|---|---|
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 47 | 22 | 25 |
| | 49.0 | 45.8 | 52.1 |
| NO | 45 | 24 | 21 |
| | 46.9 | 50.0 | 43.8 |
| DON'T KNOW | 4 | 2 | 2 |
| | 4.2 | 4.2 | 4.2 |
| NOT ANSWERING | | | |

---

QUESTION NO. 10

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 34 | 18 | 16 |
| | 35.4 | 37.5 | 33.3 |
| NO | 56 | 28 | 28 |
| | 58.3 | 58.3 | 58.3 |
| DON'T KNOW | 6 | 2 | 4 |
| | 6.3 | 4.2 | 8.3 |
| NOT ANSWERING | | | |

---

QUESTION NO. 11

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 27 | 11 | 16 |
| | 28.1 | 22.9 | 33.3 |
| NO | 65 | 36 | 29 |
| | 67.7 | 75.0 | 60.4 |
| DON'T KNOW | 4 | 1 | 3 |
| | 4.2 | 2.1 | 6.3 |
| NOT ANSWERING | | | |

---

QUESTION NO. 12

BASE: INCLUDES THREE "MISSING" QUESTIONNAIRES

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 56 | 29 | 27 |
| | 58.3 | 60.4 | 56.3 |
| NO | 35 | 17 | 17 |
| | 36.5 | 35.4 | 37.5 |
| DON'T KNOW | 5 | 2 | 3 |
| | 5.2 | 4.2 | 6.3 |
| NOT ANSWERING | | | |

---

QUESTION NO. 13

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 60 | 29 | 31 |
| | 62.5 | 60.4 | 64.6 |
| NO | 30 | 16 | 14 |
| | 31.3 | 33.3 | 29.2 |
| DON'T KNOW | 6 | 3 | 3 |
| | 6.3 | 6.3 | 6.3 |
| NOT ANSWERING | | | |

---

QUESTION NO. 14

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS 1–63 | 64–118 |
|---|---|---|---|
| ALL RESPONDENTS | 96<br>100.0 | 48<br>100.0 | 48<br>100.0 |
| YES | 72<br>75.0 | 38<br>79.2 | 34<br>70.8 |
| NO | 21<br>21.9 | 8<br>16.7 | 13<br>27.1 |
| DON'T KNOW | 3<br>3.1 | 2<br>4.2 | 1<br>2.1 |
| NOT ANSWERING | | | |

QUESTION NO. 15A

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS 1–63 | 64–118 |
|---|---|---|---|
| ALL RESPONDENTS | 96<br>100.0 | 48<br>100.0 | 48<br>100.0 |
| CORRECT | 28<br>29.2 | 14<br>29.2 | 14<br>29.2 |
| INCORRECT | 60<br>6.25 | 30<br>62.5 | 30<br>62.5 |
| DON'T KNOW | 8<br>8.3 | 4<br>8.3 | 4<br>8.3 |
| NOT ANSWERING | | | |

QUESTION NO. 15B

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| CORRECT | 44 | 22 | 22 |
| | 45.8 | 45.8 | 45.8 |
| INCORRECT | 43 | 22 | 21 |
| | 44.8 | 45.8 | 43.8 |
| DON'T KNOW | 8 | 4 | 4 |
| | 8.3 | 8.3 | 8.3 |
| NOT ANSWERING | 1 | | 1 |
| | 1.0 | | 2.1 |

QUESTION NO. 15C

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 | 48 | 48 |
| | 100.0 | 100.0 | 100.0 |
| CORRECT | 36 | 19 | 17 |
| | 37.5 | 39.6 | 35.4 |
| INCORRECT | 54 | 27 | 27 |
| | 56.3 | 56.3 | 56.3 |
| DON'T KNOW | 5 | 2 | 3 |
| | 5.2 | 4.2 | 6.3 |
| NOT ANSWERING | 1 | | 1 |
| | 1.0 | | 2.1 |

QUESTION NO. 15D

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 100.0 | 48 100.0 | 48 100.0 |
| CORRECT | 40 41.7 | 17 35.4 | 23 47.9 |
| INCORRECT | 49 51.0 | 27 56.3 | 22 45.8 |
| DON'T KNOW | 7 7.3 | 4 8.3 | 3 6.3 |
| NOT ANSWERING | | | |

QUESTION NO. 16

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 100.0 | 48 100.0 | 48 100.0 |
| A | 6 6.3 | 4 8.3 | 2 4.2 |
| B | 39 40.6 | 22 45.8 | 17 35.4 |
| C | 49 51.0 | 21 43.8 | 28 58.3 |
| NOT ANSWERING | 2 2.1 | 1 2.1 | 1 2.1 |

QUESTION NO. 17

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
|---|---|---|---|
| | TOTAL | 1–63 | 64–118 |
| ALL RESPONDENTS | 96 100.0 | 48 100.0 | 48 100.0 |
| LEAN TOWARD | 64 66.7 | 32 66.7 | 32 66.7 |
| LEAN AGAINST | 30 31.3 | 15 31.3 | 15 31.3 |
| NOT ANSWERING | 2 2.1 | 1 2.1 | 1 2.1 |

### APPENDIX E

January 1992 Jury Survey Split–Half Reliability Analysis by Professor Hans Zeisel

DEATH PENALTY SURVEY
JANUARY 1992
Table 2–1
QUESTION NUMBER 1

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
|---|---|---|---|
| | TOTAL | 1–60 | 61–121 |
| ALL RESPONDENTS | 95 100.0 | 47 100.0 | 48 100.0 |
| YES | 34 35.8 | 10 21.3 | 24 50.0 |
| NO | 60 63.2 | 36 76.6 | 24 50.0 |
| DON'T KNOW | | | |
| NOT ANSWERING | 1 1.1 | 1 2.1 | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 3–1
QUESTION NUMBER 2

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| | | 1–60 | 61–121 |
| --- | --- | --- | --- |
| ALL RESPONDENTS | 95<br>100.0 | 47<br>100.0 | 48<br>100.0 |
| YES | 38<br>40.0 | 17<br>36.2 | 21<br>43.8 |
| NO | 55<br>57.9 | 30<br>63.8 | 25<br>52.1 |
| DON'T KNOW | 2<br>2.1 | | 2<br>4.2 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 4–1
QUESTION NUMBER 3

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| | | 1–60 | 61–121 |
| --- | --- | --- | --- |
| ALL RESPONDENTS | 95<br>100.0 | 47<br>100.0 | 48<br>100.0 |
| YES | 30<br>31.6 | 16<br>34.0 | 14<br>29.2 |
| NO | 60<br>63.2 | 29<br>61.7 | 31<br>64.6 |
| DON'T KNOW | 5<br>5.3 | 2<br>4.3 | 3<br>6.3 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 5–1
QUESTION NUMBER 4

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| | | 1–60 | 61–121 |
| --- | --- | --- | --- |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 14 | 6 | 8 |
| | 14.7 | 12.8 | 16.7 |
| NO | 79 | 41 | 38 |
| | 83.2 | 87.2 | 79.2 |
| DON'T KNOW | 2 | | 2 |
| | 2.1 | | 4.2 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 6–1
QUESTION NUMBER 5

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| | | 1–60 | 61–121 |
| --- | --- | --- | --- |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 29 | 12 | 17 |
| | 30.5 | 25.5 | 35.4 |
| NO | 62 | 33 | 29 |
| | 65.3 | 70.2 | 60.4 |
| DON'T KNOW | 4 | 2 | 2 |
| | 4.2 | 4.3 | 4.2 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 7-1
QUESTION NUMBER 6

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1-60 | 61-121 |
| ALL RESPONDENTS | 95 100.0 | 47 100.0 | 48 100.0 |
| YES | 56 58.9 | 24 51.1 | 32 66.7 |
| NO | 33 34.7 | 19 40.4 | 14 29.2 |
| DON'T KNOW | 6 6.3 | 4 8.5 | 2 4.2 |
| NOT ANSWERING | | | |

---

DEATH PENALTY SURVEY
JANUARY 1992
Table 8-1
QUESTION NUMBER 7

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1-60 | 61-121 |
| ALL RESPONDENTS | 95 100.0 | 47 100.0 | 48 100.0 |
| YES | 48 50.5 | 21 44.7 | 27 56.3 |
| NO | 40 42.1 | 23 48.9 | 17 35.4 |
| DON'T KNOW | 7 7.4 | 3 6.4 | 4 8.3 |
| NOT ANSWERING | | | |

---

DEATH PENALTY SURVEY
JANUARY 1992
Table 9–1
QUESTION NUMBER 8

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | | RESPONDENT NUMBERS | |
| | TOTAL | 1–60 | 61–121 |
|---|---|---|---|
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 42 | 21 | 21 |
| | 44.2 | 44.7 | 43.8 |
| NO | 49 | 25 | 24 |
| | 51.6 | 53.2 | 50.0 |
| DON'T KNOW | 4 | 1 | 3 |
| | 4.2 | 2.1 | 6.3 |
| NOT ANSWERING | | | |

-----

DEATH PENALTY SURVEY
JANUARY 1992
Table 10–1
QUESTION NUMBER 9

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | | RESPONDENT NUMBERS | |
| | TOTAL | 1–60 | 61–121 |
|---|---|---|---|
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 56 | 28 | 28 |
| | 58.9 | 59.6 | 58.3 |
| NO | 37 | 19 | 18 |
| | 38.9 | 40.4 | 37.5 |
| DON'T KNOW | 2 | | 2 |
| | 2.1 | | 4.2 |
| NOT ANSWERING | | | |

-----

DEATH PENALTY SURVEY
JANUARY 1992
Table 11–1
QUESTION NUMBER 10

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1–60 | 61–121 |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 38 | 19 | 19 |
| | 40.0 | 40.4 | 39.6 |
| NO | 55 | 27 | 28 |
| | 57.9 | 57.4 | 58.3 |
| DON'T KNOW | 2 | 1 | 1 |
| | 2.1 | 2.1 | 2.1 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 12–1
QUESTION NUMBER 11

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | TOTAL | 1–60 | 61–121 |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 37 | 20 | 17 |
| | 38.9 | 42.6 | 35.4 |
| NO | 54 | 26 | 28 |
| | 56.8 | 55.3 | 58.3 |
| DON'T KNOW | 4 | 1 | 3 |
| | 4.2 | 2.1 | 6.3 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 13–1
QUESTION NUMBER 12

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
 QUESTION

| | | RESPONDENT NUMBERS | |
| | TOTAL | 1–60 | 61–121 |
|---|---|---|---|
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 34 | 16 | 18 |
| | 35.8 | 34.0 | 37.5 |
| NO | 55 | 29 | 26 |
| | 57.9 | 61.7 | 54.2 |
| DON'T KNOW | 6 | 2 | 4 |
| | 6.3 | 4.3 | 8.3 |
| NOT ANSWERING | | | |

---

DEATH PENALTY SURVEY
JANUARY 1992
Table 14–1
QUESTION NUMBER 13

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
 QUESTION

| | | RESPONDENT NUMBERS | |
| | TOTAL | 1–60 | 61–121 |
|---|---|---|---|
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 48 | 21 | 27 |
| | 50.5 | 44.7 | 56.3 |
| NO | 40 | 24 | 16 |
| | 42.1 | 51.1 | 33.3 |
| DON'T KNOW | 7 | 2 | 5 |
| | 7.4 | 4.3 | 10.4 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 15–1
QUESTION NUMBER 14

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–60 | 61–121 |
| ALL RESPONDENTS | 95<br>100.0 | 47<br>100.0 | 48<br>100.0 |
| YES | 53<br>55.8 | 28<br>59.6 | 25<br>52.1 |
| NO | 37<br>38.9 | 16<br>34.0 | 21<br>43.8 |
| DON'T KNOW | 5<br>5.3 | 3<br>6.4 | 2<br>4.2 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 16–1
QUESTION NUMBER 15A

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
| --- | --- | --- | --- |
| | | 1–60 | 61–121 |
| ALL RESPONDENTS. | 95<br>100.0 | 47<br>100.0 | 48<br>100.0 |
| CORRECT | 31<br>32.6 | 16<br>34.0 | 15<br>31.3 |
| INCORRECT | 56<br>58.9 | 27<br>57.4 | 29<br>60.4 |
| DON'T KNOW | 7<br>7.4 | 4<br>8.5 | 3<br>6.3 |
| NOT ANSWERING | 1<br>1.1 | | 1<br>2.1 |

DEATH PENALTY SURVEY
JANUARY 1992
Table 17–1
QUESTION NUMBER 15B

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
| | TOTAL | 1–60 | 61–121 |
| --- | --- | --- | --- |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| CORRECT | 47 | 23 | 24 |
| | 49.5 | 48.9 | 50.0 |
| INCORRECT | 38 | 20 | 18 |
| | 40.0 | 42.6 | 37.5 |
| DON'T KNOW | 6 | 3 | 3 |
| | 6.3 | 6.4 | 6.3 |
| NOT ANSWERING | 4 | 1 | 3 |
| | 4.2 | 2.1 | 6.3 |

DEATH PENALTY SURVEY
JANUARY 1992
Table 18–1
QUESTION NUMBER 15C

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | | RESPONDENT NUMBERS | |
| | TOTAL | 1–60 | 61–121 |
| --- | --- | --- | --- |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| CORRECT | 35 | 17 | 18 |
| | 36.8 | 36.2 | 37.5 |
| INCORRECT | 52 | 26 | 26 |
| | 54.7 | 55.3 | 54.2 |
| DON'T KNOW | 6 | 3 | 3 |
| | 6.3 | 6.4 | 6.3 |
| NOT ANSWERING | 2 | 1 | 1 |
| | 2.1 | 2.1 | 2.1 |

DEATH PENALTY SURVEY
JANUARY 1992
Table 19–1
QUESTION NUMBER 15D

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS 1–60 | RESPONDENT NUMBERS 61–121 |
|---|---|---|---|
| ALL RESPONDENTS | 95 100.0 | 47 100.0 | 48 100.0 |
| CORRECT | 36 37.9 | 14 29.8 | 22 45.8 |
| INCORRECT | 52 54.7 | 28 59.6 | 24 50.0 |
| DON'T KNOW | 6 6.3 | 4 8.5 | 2 4.2 |
| NOT ANSWERING | 1 1.1 | 1 2.1 | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 20–1
QUESTION NUMBER 16

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY QUESTION

| | TOTAL | RESPONDENT NUMBERS 1–60 | RESPONDENT NUMBERS 61–121 |
|---|---|---|---|
| ALL RESPONDENTS | 95 100.0 | 47 100.0 | 48 100.0 |
| A | 2 2.1 | | 2 4.2 |
| B | 40 42.1 | 21 44.7 | 19 39.6 |
| C | 53 55.8 | 26 55.3 | 27 56.3 |
| NOT ANSWERING | | | |

DEATH PENALTY SURVEY
JANUARY 1992
Table 21–1
QUESTION NUMBER 17

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
|---|---|---|---|
| | | 1–60 | 61–121 |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| LEAN TOWARD | 52 | 25 | 27 |
| | 54.7 | 53.2 | 56.3 |
| LEAN AGAINST | 42 | 22 | 20 |
| | 44.2 | 46.8 | 41.7 |
| NOT ANSWERING | 1 | | 1 |
| | 1.1 | | 2.1 |

DEATH PENALTY SURVEY
JANUARY 1992
Table 22–1
QUESTION NUMBER 18

BASE: EXCLUDES THOSE DISQUALIFYING ON BASIS OF INTRODUCTORY
QUESTION

| | TOTAL | RESPONDENT NUMBERS | |
|---|---|---|---|
| | | 1–60 | 61–121 |
| ALL RESPONDENTS | 95 | 47 | 48 |
| | 100.0 | 100.0 | 100.0 |
| YES | 3 | 2 | 1 |
| | 3.2 | 4.3 | 2.1 |
| NO | 92 | 45 | 47 |
| | 96.8 | 95.7 | 97.9 |
| DON'T KNOW | | | |
| NOT ANSWERING | | | |

APPENDIX F

April 1990 Jury Survey Analysis of
Results Grouped by Topic by
Professor Hans Zeisel

N.B. The underscored interval indicates
the range in which we expect to fall the
true proportion (to be distinguished from
the sample) with a 95% confidence level.

I. QUESTIONS 4 AND 5 RELATING TO
WHETHER JURORS MUST UNANI-
MOUSLY AGREE ON MITIGATING
FACTORS

Question 4

A juror decides that the fact that Mr.
Woods was only 25 years of age when he
committed the murder is a mitigating fac-

tor sufficient to preclude the death penalty. However the other eleven jurors disagree and insist that his age is not a mitigating factor. The one juror believes that she cannot consider a mitigating factor unless the entire jury agrees upon it and votes for the death penalty. She votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | | |
|---|---|---|---|---|
| Yes | 25.0 | (24) | — | [INCORRECT ANSWER] |
| No | 66.7 | (64) | | |
| Do Not Know | 8.3 | ( 8) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (96) | | |

Margin of Error
(On Incorrect Answer)

25.0% ± 8.7% = 16.3% − 33.7%

---

*Question 5*

A juror decides that the fact that Mr. Woods was good to his family is a mitigating factor sufficient to preclude the death penalty. However, the other eleven jurors disagree. The other jurors insist that no juror should consider the defendant's good relations with his family as a mitigating factor unless they all agree it is a mitigating factor. The one juror accepts this approach and votes for the death penalty.

Has the juror followed the judge's instructions?

| | % | N | | |
|---|---|---|---|---|
| Yes | 36.5 | (35) | — | [INCORRECT ANSWER] |
| No | 56.3 | (54) | | |
| Do Not Know | 7.3 | ( 7) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (96) | | |

Margin of Error
(On Incorrect Answer)

36.5% ± 9.6% = 26.9% − 46.1%

---

II. QUESTIONS 1, 2, 7, 8, 9, 10 AND 11 RELATING TO CONSIDERATION OF NON–STATUTORY MITIGATING FACTORS

*Question 1*

The juror, going over all the mitigating circumstances, finds that all of them were minor and that none of them are a major

mitigating circumstance. However, the juror votes against the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 29.2 | (28) | |
| No | 65.6 | (63) | — [INCORRECT ANSWER] |
| Do Not Know | 5.2 | ( 5) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0% | (96) | |

Margin of Error
(On Incorrect Answer)

65.6% ± 9.5% = 56.1% — 75.1%

---

*Question 2*

A juror is persuaded that the fact that Mr. Woods was good as a boy is a mitigating factor sufficient to preclude the death penalty. However, she notes that being a good child is not one of the mitigating factors which the judge specifically mentioned. She also believes that being a good child is not an excuse for the murder which is comparable to the other mitigating factors which the judge specifically mentioned. For this reason, she concludes that she has no choice and must vote for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 56.3 | (54) | — [INCORRECT ANSWER] |
| No | 38.5 | (37) | |
| Do Not Know | 5.2 | ( 5) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0% | (96) | |

Margin of Error
(On Incorrect Answer)

56.3% ± 9.9% = 46.4% — 66.2%

---

*Question 7*

A juror decides that the fact that Mr. Woods did not kill more than one person is a reason sufficient not to sentence him to death. However, she also concludes that this fact is not one of the mitigating factors which the judge specifically mentioned. She also does not believe this fact provides a reason to spare the defendant's life that is comparable to any with the mitigating factors which the judge specifically mentioned. She concludes that as a result she must vote for the death penalty and does so.

Has the juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 64.6 | (62) | — [INCORRECT ANSWER] |
| No | 29.2 | (28) | |
| Do Not Know | 6.3 | ( 6) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0% | (96) | |

Margin of Error
(On Incorrect Answer)

64.6% ± 9.6% = 55.0% − 74.2%

---

*Question 8*

A juror decides that the fact that Mr. Woods did not actually rape either of the women is a mitigating factor sufficient to preclude the death penalty. She votes against the death penalty.

Has the juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 28.1 | (27) | |
| No | 65.6 | (63) | — [INCORRECT ANSWER] |
| Do Not Know | 5.2 | ( 5) | |
| No Answer | 1.0 | ( 1) | |
| TOTAL | 100.0% | (96) | |

Margin of Error
(On Incorrect Answer)

65.6% ± 9.5% = 56.1% − 75.1%

---

*Question 9*

A juror decides that Mr. Woods had a significant criminal record. However, the juror also concludes that the fact that none of Mr. Woods prior crimes was violent is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

| | % | N |
|------------|--------|------|
| Yes | 49.0 | (47) |
| No | 46.9 | (45) — [INCORRECT ANSWER] |
| Do Not Know | 4.2 | ( 4) |
| No Answer | . | ( ) |
| TOTAL | 100.0% | (96) |

Margin of Error
(On Incorrect Answer)

46.9% ± 10.0% = 36.9% — 56.9%

---

*Question 10*

A juror decides that Mr. Woods will never be rehabilitated to useful citizenship. But she also decides that Mr. Woods may be rehabilitated enough to be a safe and obedient prisoner. She concludes that this is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has the juror followed the judge's instructions?

| | % | N |
|------------|--------|------|
| Yes | 35.4 | (34) |
| No | 58.3 | (56) — [INCORRECT ANSWER] |
| Do Not Know | 6.3 | ( 6) |
| No Answer | . | ( ) |
| TOTAL | 100.0% | (96) |

Margin of Error
(On Incorrect Answer)

58.3% ± 9.9% = 48.4% — 68.2%

---

*Question 11*

A juror decides that the fact that Mr. Woods very much regretted what he did is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has the juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 28.1 | (27) | |
| No | 67.7 | (65) | — [INCORRECT ANSWER] |
| Do Not Know | 4.2 | ( 4) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0 % | (96) | |

Margin of Error
(On Incorrect Answer)

$67.7\% \pm 9.4\% = \underline{58.3\% - 77.1\%}$

---

III. QUESTION 3 RELATING TO WHETHER EXISTENCE OF MITIGATING FACTOR MANDATES LIFE

*Question 3*

A juror decides that Mr. Woods was under the influence of an extreme emotional disturbance at the time he committed the murder. She decides that this fact is not a sufficient mitigating factor to preclude the death penalty and votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 51.0 | (49) | |
| No | 43.8 | (42) | — [INCORRECT ANSWER] |
| Do Not Know | 5.2 | ( 5) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0 % | (96) | |

Margin of Error
(On Incorrect Answer)

$43.8\% \pm 9.9\% = \underline{33.9\% - 53.7\%}$

---

IV. QUESTIONS 12, 13, 14 AND 15 RELATING TO BURDEN OF PERSUASION

*Question 12*

A juror considers all the evidence and comes to the conclusion that the mitigating evidence outweighs the aggravating evidence and that death is not appropriate. However, she cannot find a mitigating factor that is sufficient to *preclude* the death penalty. The juror votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 58.3 | (56) | — [INCORRECT ANSWER] |
| No | 36.5 | (35) | |
| Do Not Know | 5.2 | ( 5) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0 % | (96) | |

Margin of Error
(On Incorrect Answer)

58.3% ± 9.9% = 48.4% − 68.2%

---

## Question 13

After hearing all the evidence in this case, a juror is not persuaded one way or another as to whether there are or are not mitigating factors sufficient to preclude the death penalty. Because the juror has not found that there is a mitigating factor sufficient to preclude death, the juror votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 62.5 | (60) | — [INCORRECT ANSWER] |
| No | 31.3 | (30) | |
| Do Not Know | 6.3 | ( 6) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0 % | (96) | |

Margin of Error
(On Incorrect Answer)

62.5% ± 9.7% = 52.8% − 7.2%

---

## Question 14

A juror believes that what Mr. Woods did is terrible, but in her personal judgment it is not so terrible that he should be given the death penalty. However, on the other hand, she believes the mitigating evidence is no excuse whatsoever for what Mr. Woods did and that there are no mitigating factors sufficient to preclude the death penalty in this case. She votes for the death penalty.

Has she followed the judge's instructions?

| | % | N |
|----------|---------|------|
| Yes | 75.0 | (72) | — [INCORRECT ANSWER] |
| No | 21.9 | (21) |
| Do Not Know | 3.1 | ( 3) |
| No Answer | . | ( ) |
| TOTAL | 100.0 % | (96) |

Margin of Error
(On Incorrect Answer)

75.0% ± 8.7% = 66.3% — 83.7%

---

*Question 15A*

The jury in stage one found the defendant eligible for death. Which, if any, of the following four statements are correct and which if any are incorrect under the instructions given by the judge in this case:

Once the jury finds the defendant is eligible for death, the prosecution must prove that mitigating factors do not exist; unless it does, the jury must vote against the death penalty.

| | % | N |
|----------|---------|------|
| Correct | 29.2 | (28) |
| Incorrect | 62.5 | (60) |
| Do Not Know | 8.3 | ( 8) |
| No Answer | . | ( ) |
| TOTAL | 100.0 % | (96) |

Margin of Error
(On "Incorrect" Answer)

62.5% ± 9.7% = 52.8% — 72.2%

---

*Question 15B*

Once the jury finds the defendant is eligible for death, the defendant must prove

to the jury that mitigating factors exist; unless he does, the jury must vote for the death penalty.

| | % | N |
|----------|---------|------|
| Correct | 45.8 | (44) |
| Incorrect | 44.8 | (43) |
| Do Not Know | 8.3 | ( 8) |
| No Answer | 1.0 | ( 1) |
| TOTAL | 100.0 % | (96) |

Margin of Error
(On "Correct" Answer)

45.8% ± 10.0% = 35.8% — 55.8%

*Question 15C*

Once the jury finds the defendant is eligible for death, the prosecution must prove that the death penalty should be imposed; unless it does, the jury must vote against the death penalty.

| | % | N |
|---|---|---|
| Correct | 37.5 | (36) |
| Incorrect | 56.3 | (54) |
| Do Not Know | 5.2 | ( 5) |
| No Answer | 1.0 | ( 1) |
| TOTAL | 100.0 % | (96) |

Margin of Error
(On "Incorrect" Answer)

$56.3\% \pm 9.9\% = \underline{46.4\% - 66.2\%}$

*Question 15D*

Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that the death penalty should not be imposed; unless he does, the jury must vote for the death penalty.

| | % | N |
|---|---|---|
| Correct | 41.7 | (40) |
| Incorrect | 51.0 | (49) |
| Do Not Know | 7.3 | ( 7) |
| No Answer | . | ( ) |
| TOTAL | 100.0 % | (96) |

Margin of Error
(On "Correct" Answer)

$41.7\% \pm 9.9\% = \underline{31.8\% - 51.6\%}$

QUESTION 16 RELATING TO UNDER-STANDING OF UNANIMITY REQUIREMENT ON UL-TIMATE VERDICT OF DEATH

*Question 16*

After deliberating for two days, nine jurors are convinced that death should be imposed. Three jurors believe death should not be imposed. The jurors are all convinced that they will not change their mind. Read the following three statements and check the one which best describes, under the judge's instruction, what the jury should do:

(_____) (a) All sign the verdict form "we, the jury, unanimously find that there are no mitigating factors sufficient to preclude the imposition of a death sentence."

(_____) (b) All sign the verdict form "we, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence."

(_____) (c) Tell the judge they cannot reach a unanimous verdict.

| | % | N | | |
|---|---|---|---|---|
| (a) | 6.3 | (6) | — | [INCORRECT ANSWER] |
| (b) | .40.6 | (39) | | |
| (c) | 51.0 | (49) | — | [INCORRECT ANSWER] |
| No Answer | 2.1 | (2) | | |
| TOTAL | 100.0% | (96) | | |

Margin of Error
(On Incorrect Answers (a) & (c))

(a): 6.3% ± 4.8% = 1.5% — 11.1%
(c): 51.0% ± 10.0% = 41.0% — 61.0%

---

APPENDIX G

January 1992 Jury Survey Analysis of Results Grouped by Topic by Professor Hans Zeisel

N.B. The underscored interval indicates the range in which we expect to fall the true proportion (to be distinguished from the sample) with a 95% confidence level.

I. QUESTIONS 4 AND 5 RELATING TO WHETHER JURORS MUST UNANIMOUSLY AGREE ON MITIGATING FACTORS

*Question 4*

A juror decides that the fact that Mr. Woods was only 25 years of age when he committed the murder is a mitigating factor sufficient to preclude the death penalty. However the other eleven jurors disagree and insist that his age is not a mitigating factor. The one juror believes that she cannot consider a mitigating factor unless the entire jury agrees upon it and votes for the death penalty. She votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 14.7 | (14) | — [INCORRECT ANSWER] |
| No | 83.2 | (79) | |
| Do Not Know | 2.1 | ( 2) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0% | (95) | |

Margin of Error
(On Incorrect Answer)

14.7% ± 7.1% = 7.6% — 21.9%

*Question 5*

A juror decides that the fact that Mr. Woods was good to his family is a mitigating factor sufficient to preclude the death penalty. However, the other eleven jurors disagree. The other jurors insist that no juror should consider the defendant's good relations with his family as a mitigating factor unless they all agree it is a mitigating factor. The one juror accepts this approach and votes for the death penalty.

Has the juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 30.5 | (29) | — [INCORRECT ANSWER] |
| No | 65.3 | (62) | |
| Do Not Know | 4.2 | ( 4) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0% | (95) | |

Margin of Error
(On Incorrect Answer)

30.5% ± 9.3% = 21.3% — 39.8%

II. QUESTIONS 1, 2, 6, 7, 8, 9, 10 AND 11 RELATING TO CONSIDERATION OF NON–STATUTORY MITIGATING FACTORS

*Question 1*

The juror, going over all the mitigating circumstances, finds that all of them were minor and that none of them are a major mitigating circumstance. However, the juror votes against the death penalty.

Has that juror followed the judge's instructions?

| | % | N |
|--------|--------|------|
| Yes | 35.8 | (34) |
| No | 63.2 | (60) — [INCORRECT ANSWER] |
| Do Not Know | 0.0 | ( 0) |
| No Answer | 1.1 | ( 1) |
| TOTAL | 100.0% | (95) |

### Margin of Error
#### (On Incorrect Answer)

63.2% ± 9.7% = 53.5% — 72.9%

---

*Question 2*

A juror is persuaded that the fact that Mr. Woods was good as a boy is a mitigating factor sufficient to preclude the death penalty. However, she notes that being a good child is not one of the mitigating factors which the judge specifically mentioned. She also believes that being a good child is not an excuse for the murder which is comparable to the other mitigating factors which the judge specifically mentioned. For this reason, she concludes that she has no choice and must vote for the death penalty.

Has that juror followed the judge's instructions?

| | % | N |
|--------|--------|------|
| Yes | 40.0 | (38) — [INCORRECT ANSWER] |
| No | 57.9 | (55) |
| Do Not Know | 2.1 | ( 2) |
| No Answer | . | ( ) |
| TOTAL | 100.0% | (95) |

### Margin of Error
#### (On Incorrect Answer)

40.0% ± 9.9% = 30.1% — 49.9%

---

*Question 6*

A juror decides that Mr. Woods was not under the influence of an extreme emotional disturbance when he committed the murder, but that he did suffer from a mild emotional disturbance at the time of the murder. She concludes that the judge's instructions required that an emotional disturbance be an "extreme" disturbance in order to be a sufficient mitigating factor, and thus a mild emotional disturbance cannot be a mitigating factor sufficient to preclude death. She votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | | |
|---|---|---|---|---|
| Yes | 58.9 | (56) | – | [INCORRECT ANSWER] |
| No | 34.7 | (33) | | |
| Do Not Know | 6.3 | ( 6) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (95) | | |

Margin of Error
(On Incorrect Answer)
58.9% ± 9.9% = 49.1% — 68.8%

---

*Question 7*

A juror decides that the fact that Mr. Woods did not kill more than one person is a reason sufficient not to sentence him to death. However, she also concludes that this fact is not one of the mitigating factors which the judge specifically mentioned. She also does not believe this fact provides a reason to spare the defendant's life that is comparable to any with the mitigating factors which the judge specifically mentioned. She concludes that as a result she must vote for the death penalty and does so.

Has the juror followed the judge's instructions?

| | % | N | | |
|---|---|---|---|---|
| Yes | 50.5 | (48) | – | [INCORRECT ANSWER] |
| No | 42.1 | (40) | | |
| Do Not Know | 7.4 | ( 7) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (95) | | |

Margin of Error
(On Incorrect Answer)

50.5% ± 10.1% = 40.5% — 60.6%

---

*Question 8*

A juror decides that the fact that Mr. Woods did not actually rape either of the women is a mitigating factor sufficient to preclude the death penalty. She votes against the death penalty.

Has the juror followed the judge's instructions?

| | % | N |
|-------|-------|-----|
| Yes | 44.2 | (42) |
| No | 51.6 | (49) – [INCORRECT ANSWER] |
| Do Not Know | 4.2 | ( 4) |
| No Answer | 0.0 | ( 0) |
| TOTAL | 100.0% | (95) |

### Margin of Error
(On Incorrect Answer)

51.6% ± 10.0% = 41.5% — 61.6%

---

*Question 9*

A juror decides that Mr. Woods had a significant criminal record. However, the juror also concludes that the fact that none of Mr. Woods prior crimes was violent is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has that juror followed the judge's instructions?

| | % | N |
|-------|-------|-----|
| Yes | 58.9 | (56) |
| No | 38.9 | (37) – [INCORRECT ANSWER] |
| Do Not Know | 2.1 | ( 2) |
| No Answer | . | ( ) |
| TOTAL | 100.0% | (95) |

### Margin of Error
(On Incorrect Answer)

38.9% ± 9.8% = 29.1% — 48.8%

---

*Question 10*

A juror decides that Mr. Woods will never be rehabilitated to useful citizenship. But she also decides that Mr. Woods may be rehabilitated enough to be a safe and obedient prisoner. She concludes that this is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has the juror followed the judge's instructions?

**780**

| | % | N | | |
|---|---|---|---|---|
| Yes | 40.0 | (38) | | |
| No | 57.9 | (55) | – | [INCORRECT ANSWER] |
| Do Not Know | 2.1 | ( 2) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (95) | | |

Margin of Error
(On Incorrect Answer)

57.9% ± 9.9% = <u>48.0% — 67.8%</u>

---

*Question 11*

A juror decides that the fact that Mr. Woods very much regretted what he did is a mitigating factor sufficient to preclude the death penalty and votes against the death penalty.

Has the juror followed the judge's instructions?

| | % | N | | |
|---|---|---|---|---|
| Yes | 38.9 | (37) | | |
| No | 56.8 | (54) | – | [INCORRECT ANSWER] |
| Do Not Know | 4.2 | ( 4) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (95) | | |

Margin of Error
(On Incorrect Answer)

56.8% ± 10.0% = <u>46.9% — 66.8%</u>

---

III. QUESTION 3 RELATING TO WHETHER EXISTENCE OF MITIGATING FACTOR MANDATES LIFE

*Question 3*

A juror decides that Mr. Woods was under the influence of an extreme emotional disturbance at the time he committed the murder. She decides that this fact is not a sufficient mitigating factor to preclude the death penalty and votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 31.6 | (30) | |
| No | 63.2 | (60) | – [INCORRECT ANSWER] |
| Do Not Know | 5.8 | ( 5) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0 % | (95) | |

Margin of Error
(On Incorrect Answer)

$63.2\% \pm 9.7\% = \underline{53.5\% - 72.9\%}$

## IV. QUESTIONS 12, 13, 14 AND 15 RELATING TO BURDEN OF PERSUASION

*Question 12*

A juror considers all the evidence and comes to the conclusion that the mitigating evidence outweighs the aggravating evidence and that death is not appropriate. However, she cannot find a mitigating factor that is sufficient to *preclude* the death penalty. The juror votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | |
|---|---|---|---|
| Yes | 35.8 | (34) | – [INCORRECT ANSWER] |
| No | 57.9 | (55) | |
| Do Not Know | 6.3 | ( 6) | |
| No Answer | . | ( ) | |
| TOTAL | 100.0 % | (95) | |

Margin of Error
(On Incorrect Answer)

$35.8\% \pm 9.6\% = \underline{26.1\% - 45.4\%}$

*Question 13*

After hearing all the evidence in this case, a juror is not persuaded one way or another as to whether there are or are not mitigating factors sufficient to preclude the death penalty. Because the juror has not found that there is a mitigating factor sufficient to preclude death, the juror votes for the death penalty.

Has that juror followed the judge's instructions?

| | % | N | | |
|---|---|---|---|---|
| Yes | 50.5 | (48) | – | [INCORRECT ANSWER] |
| No | 42.1 | (40) | | |
| Do Not Know | 7.4 | ( 7) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (95) | | |

Margin of Error
(On Incorrect Answer)

50.5% ± 10.1% = 40.5% — 60.6%

---

*Question 14*

A juror believes that what Mr. Woods did is terrible, but in her personal judgment it is not so terrible that he should be given the death penalty. However, on the other hand, she believes the mitigating evidence is no excuse whatsoever for what Mr. Woods did and that there are no mitigating factors sufficient to preclude the death penalty in this case. She votes for the death penalty.

Has she followed the judge's instructions?

| | % | N | | |
|---|---|---|---|---|
| Yes | 55.8 | (53) | – | [INCORRECT ANSWER] |
| No | 38.9 | (37) | | |
| Do Not Know | 5.3 | ( 5) | | |
| No Answer | . | ( ) | | |
| TOTAL | 100.0 % | (95) | | |

Margin of Error
(On Incorrect Answer)

55.8% ± 10.0% = 45.8% — 65.8%

---

*Question 15A*

The jury in stage one found the defendant eligible for death. Which, if any, of the following four statements are correct and which if any are incorrect under the instructions given by the judge in this case:

Once the jury finds the defendant is eligible for death, the prosecution must prove that mitigating factors do not exist; unless it does, the jury must vote against the death penalty.

| | % | N |
|---|---|---|
| Correct | 32.6 | (31) |
| Incorrect | 58.9 | (56) |
| Do Not Know | 7.4 | ( 7) |
| No Answer | 1.1 | ( 1) |
| TOTAL | 100.0 % | (95) |

Margin of Error
(On "Incorrect" Answer)

$58.9\% \pm 9.9\% = \underline{49.1\% - 68.8\%}$

---

*Question 15B*

Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that mitigating factors exist; unless he does, the jury must vote for the death penalty.

| | % | N |
|---|---|---|
| Correct | 49.5 | (47) |
| Incorrect | 40.0 | (38) |
| Do Not Know | 6.3 | ( 6) |
| No Answer | 4.2 | ( 4) |
| TOTAL | 100.0 % | (95) |

Margin of Error
(On "Correct" Answer)

$49.5\% \pm 10.1\% = \underline{39.4\% - 59.5\%}$

---

*Question 15C*

Once the jury finds the defendant is eligible for death, the prosecution must prove that the death penalty should be imposed; unless it does, the jury must vote against the death penalty.

| | % | N |
|---|---|---|
| Correct | 36.8 | (35) |
| Incorrect | 54.7 | (52) |
| Do Not Know | 6.3 | ( 6) |
| No Answer | 2.1 | ( 2) |
| TOTAL | 100.0 % | (95) |

<u>Margin of Error</u>
(On "Incorrect" Answer)

54.7% ± 10.0% = <u>44.7% — 64.7%</u>

---

*Question 15D*

Once the jury finds the defendant is eligible for death, the defendant must prove to the jury that the death penalty should not be imposed; unless he does, the jury must vote for the death penalty.

| | % | N |
|---|---|---|
| Correct | 37.9 | (36) |
| Incorrect | 54.7 | (52) |
| Do Not Know | 6.3 | ( 6) |
| No Answer | 1.1 | ( 1) |
| TOTAL | 100.0 % | (95) |

<u>Margin of Error</u>
(On "Correct" Answer)

37.9% ± 9.8% = <u>28.1% — 47.7%</u>

---

## V. QUESTION 16 RELATING TO UNDERSTANDING OF UNANIMITY REQUIREMENT ON ULTIMATE VERDICT OF DEATH

*Question 16*

After deliberating for two days, nine jurors are convinced that death should be imposed. Three jurors believe death should not be imposed. The jurors are all convinced that they will not change their mind. Read the following three statements and check the one which best describes, under the judge's instruction, what the jury should do:

(_____) (a) All sign the verdict form "we, the jury, unanimously find that there are no mitigating factors sufficient to preclude the imposition of a death sentence."

(_____) (b) All sign the verdict form "we, the jury, do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence."

(_____) (c) Tell the judge they cannot reach a unanimous verdict.

| | % | N | | |
|---|---|---|---|---|
| (a) | 2.1 | ( 2) | – | [INCORRECT ANSWER] |
| (b) | 42.1 | (40) | | |
| (c) | 55.8 | (53) | – | [INCORRECT ANSWER] |
| No Answer | 0.0 | ( 0) | | |
| TOTAL | 100.0 % | (95) | | |

Margin of Error
(On Incorrect Answers (a) & (c))

| | | | | | |
|---|---|---|---|---|---|
| (a): | 2.1% | ± | 2.9% | = | 0.0% — 5.0% |
| (b): | 42.1% | ± | 9.9% | = | 32.2% — 52.0% |
| (c): | 55.8% | ± | 10.0% | = | 45.8% — 65.8% |